# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### EASTERN DIVISION

OLIVER J. HIGGINS,          )
                               )

Movant,                   )
                               )     No. 10-1316-JDT-egb

v.                          )     Crim. No. 06-10004-JDT
                               )

UNITED STATES OF AMERICA,   )
                               )

Respondent.              )

---

## ORDER ADOPTING REPORT AND RECOMMENDATION,
## DENYING MOTION PURSUANT TO 28 U.S.C. § 2255,
## DENYING CERTIFICATE OF APPEALABILITY,
## CERTIFYING AN APPEAL WOULD NOT BE TAKEN IN GOOD FAITH
## AND DENYING LEAVE TO APPEAL *IN FORMA PAUPERIS*

---

Before the Court is the *pro se* Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody ("§ 2255 Motion") filed by the Movant, Oliver J. Higgins, Bureau of Prisons register number 20518-076, who is currently an inmate at the United States Penitentiary in Terre Haute, Indiana (ECF No. 1), the Report and Recommendation ("R&R") issued by U.S. Magistrate Judge Edward G. Bryant, Jr. after a limited evidentiary hearing (ECF No. 44) and Higgins's objections to the R&R (ECF No. 56). The R&R recommended that the Court deny relief on a portion of Higgins's ineffective assistance claim. For the reasons stated below, the Court ADOPTS the R&R and DENIES Movant's § 2255 Motion.

## I.     BACKGROUND

On January 23, 2006, a federal grand jury returned a four-count indictment against Higgins. (*United States v. Higgins*, No. 06-10004-JDT (W.D. Tenn.), Crim. ECF No. 1.) Counts

1 through 3 charged that, on or about September 10, 2005, Higgins unlawfully possessed with the intent to distribute approximately 531.8 grams of cocaine base (crack cocaine) (Count 1), 250.1 grams of cocaine (Count 2), and 62 grams of marijuana (Count 3), in violation of 21 U.S.C. § 941(a)(1). Count 4 charged that, on or about September 10, 2005, Higgins possessed and concealed counterfeit Federal Reserve Notes with the intent to defraud, in violation of 18 U.S.C. § 471. On July 17, 2006, the grand jury returned a six-count superseding indictment, which added two new charges to the four counts in the original indictment. (Crim. ECF No. 25.) Count 5 charged Higgins, a convicted felon, with possessing a Charter Arms .38 Special handgun on or about September 10, 2005, in violation of 18 U.S.C. § 922(g). Count 6 charged Higgins with possessing a Charter Arms .38 Special handgun during and in furtherance of the drug trafficking crimes charged in Counts 1, 2 and 3, in violation of 18 U.S.C. § 924(c).

The factual basis for these charges is stated in the presentence investigation report ("PSR"):

> 3.     According to the information provided by the Assistant United States Attorney responsible for the prosecution of this matter, on September 9, 2005, information was obtained through an arrest made by the Henderson Police Department that Oliver Higgins was selling narcotics from his residence located at 1336 Campbell Street, Apartment #5, Jackson, Tennessee. A check of the criminal history of Oliver Higgins revealed two prior felony convictions for narcotics trafficking in Hardin County, Tennessee: Possession of Marijuana with Intent to Sell in Circuit Court Case No. 6755 in 1990 and Selling Cocaine in Circuit Court Case No. 7608 in 1998. A search warrant was obtained by Sergeant Billy Carneal with the Jackson Madison County Metro Narcotics Unit and on September 10, 2005, the search warrant was executed at Mr. Higgins' residence.

> 4.     The initial search of the residence resulted in locating Mr. Higgins in the east bedroom of the residence where he was asleep and wearing ear plugs. The following items were located in the kitchen of the residence: a partially smoked marijuana cigarette located in an ash tray, suspected crack cocaine located in a coffee cup, approximately 110.4 grams of suspected crack cocaine located in the bottom of a china cabinet, and approximately 0.1 grams of suspected crack cocaine located in a kitchen drawer next to the stove. The following items were located in the bedroom of the residence: approximately 9.1 grams of suspected

marijuana was located in a red tin can, one pack of rolling papers, four diamond rings, and two gold watches. Located in an upstairs hall closet was approximately 17.1 grams of suspected marijuana. The following items were also recovered in the ceiling of the bathroom: approximately 305.1 grams of suspected powder cocaine, approximately 41.4 grams of suspected marijuana, approximately 313.6 grams of suspected crack cocaine in 12 individual bags inside of a larger ziploc bag, approximately 134.5 grams of suspected crack cocaine in 5 individual bags inside of a larger ziploc bag, black digital scales with cocaine residue, a set of manual finger scales, $2080.00 of suspected counterfeit U.S. currency, $9,000 of U.S. currency, a Charter Arms .38 special handgun, serial number 911597, with four rounds, and a yellow Cambridge ledger.

5.     On September 20, 2005, Special Agent J. Jathaniel Cavitt with the Secret Service examined the counterfeit currency and determined that the Federal Reserve Notes were counterfeit and had been produced using ink jet technology. The total amount of counterfeit currency was $2080.00.

6.     On December 9, 2005, the Tennessee Bureau of Investigation Memphis Crime Lab confirmed the following substances that were located in Mr. Higgins' residence: 62.0 grams of marijuana, one marijuana cigarette, 531.8 grams of cocaine base, and 250.1 grams of cocaine.

7.     On August 2, 2007, Special Agent Christopher Rogers of the Bureau of Alcohol, Tobacco, Firearms and Explosives examined the Charter Arms, model Off Duty, .38 Spl. caliber revolver, serial number 911597 seized from Mr. Higgins' residence and determined that the firearm was not originally manufactured in Tennessee, and therefore, at some point traveled in interstate and/or foreign commerce. In addition, SA Rogers determined that the revolver was a "firearm" as defined in 18 U.S.C. § 921(a)(3).

(PSR ¶¶ 3-7.)

At his initial appearance on March 10, 2006, Higgins advised that he had retained Steven E. Farese, Sr. to represent him. (Min. Entry, Crim. ECF No. 9.) On August 7, 2006, at the initial appearance on the superseding indictment, Farese asked for a continuance because Higgins intended to retain new counsel. (Min. Entry, Crim. ECF No. 30.) On September 1, 2006, Farese filed a motion seeking leave to withdraw due to "certain philosophical and strategical differences . . . as to the way this case should be handled." (Crim. ECF No. 33.) The Court granted the

motion on September 11, 2006.  (Crim. ECF No. 38.)  On September 7, 2006, Daniel J. Taylor filed a notice of appearance on Higgins's behalf.  (Crim. ECF No. 36.)

On October 23, 2006, defense counsel filed a motion to suppress the results of the search. (Crim. ECF No. 44.)  The Government responded to the suppression motion on October 30, 2006.  (Crim. ECF No. 45.)

On December 29, 2006, Higgins filed a *pro se* motion to dismiss his attorney.  (Crim. ECF No. 53.)  In an order issued on January 30, 2007, the Court denied the motion because Higgins had not established his financial eligibility for appointed counsel and because his "vaguely expressed displeasure with Mr. Taylor's lack of investigation into the case is not a sufficient reason for the Court to intervene in the attorney-client relationship."  (Crim. ECF No. 54.)  However, at a report date on February 12, 2007, the Court allowed Taylor to withdraw, determined that Higgins was eligible for appointed counsel, and directed that an attorney from the Criminal Justice Act Panel be appointed.  (Min. Entry, Crim. ECF No. 55.)  Jack Colin Morris was subsequently appointed to represent Higgins.  (Crim. ECF No. 57.)

The Court conducted a suppression hearing on June 19, 2007 and, at the conclusion of that hearing, orally denied the motion to suppress.  (Min. Entry, Crim. ECF No. 63; Suppression Hr'g Tr., Crim. ECF No. 112.)  The Court  also entered a written order confirming that denial. (Crim. ECF No. 66.)

On July 2, 2007, Higgins filed two *pro se* motions seeking to reopen the proof on the motion to suppress.  (Crim. ECF Nos. 67 & 68.)  In an order issued on July 6, 2007, the Court denied Higgins's *pro se* motions because he was represented by counsel.  (Crim. ECF No. 69.) At that point, Higgins began filing various other *pro se* motions.  On July 19, 2007, he filed a motion seeking the appointment of substitute counsel.  (Crim. ECF No. 70.)  On July 23, 2007,

he filed a Motion to Challenge 21 U.S.C. § 851 Information. (Crim. ECF No. 71.) On July 24, 2007, Higgins filed additional exhibits in support of his motion challenging a potential § 851 information. (Crim. ECF No. 72.) On July 30, 2007, he filed a motion to dismiss the superseding indictment. (Crim. ECF No. 73.) On July 31, 2007, the Court denied the motion to dismiss the superseding indictment, again because a litigant who is represented by counsel cannot file *pro se* motions. (Crim. ECF No. 74.)

On July 31, 2007, defense counsel Morris filed a motion seeking leave to withdraw. (Crim. ECF No. 75.) The Court denied that motion, and Higgins's similar *pro se* motion, on August 2, 2007. (Crim. ECF No. 77.) The order explained, *inter alia*, that

> [t]his case is currently set for trial on August 8, 2007. It appears that the Defendant is merely attempting to manipulate the Court and delay this case indefinitely by continually asking for new counsel. The Court is certain that if Defendant were provided with a fourth attorney, he would soon find fault with that individual as well.

(*Id.* at 2.)

On August 7, 2007, the Government filed a notice under 21 U.S.C. § 851 about Higgins's prior convictions. (Crim. ECF No. 78.) A jury trial commenced on August 8, 2007, and, on August 9, 2007, the jury returned a guilty verdict on Counts 1, 2, 4, 5 and 6 of the Superseding Indictment. Higgins was acquitted on Count 3. (Min. Entries, Crim. ECF Nos. 79, 80 & 82; Jury Verdict, Crim. ECF No. 84.)

On August 14, 2007, defense counsel filed a motion for a judgment of acquittal. (Crim. ECF No. 87.) The Government filed its response on August 31, 2007. (Crim. ECF No. 90.) On October 1, 2007, a fourth attorney, Keith Golden, appeared on Higgins's behalf, filing a Notice of Substitution of Counsel. (Crim. ECF No. 94.)

At a hearing on December 27, 2007, the Court sentenced Higgins as a career offender to a mandatory term of life imprisonment plus five years. (Min. Entry, Crim. ECF No. 105; Sentencing Hr'g Tr., Crim. ECF No. 115.)[1] Judgment was entered on January 3, 2008. (Crim. ECF No. 107.) The United States Court of Appeals for the Sixth Circuit affirmed. *United States v. Higgins*, 557 F.3d 381 (6th Cir.), *cert. denied*, 558 U.S. 1084 (2009).

On December 9, 2010, Higgins filed the present *pro se* § 2255 Motion (ECF No. 1), accompanied by a legal memorandum (ECF No. 1-1) and a factual affidavit (ECF No. 1-2.) Higgins's § 2255 Motion presents the following claims:

1. "MOVANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AMENDMENT TO THE

---

[1] The Court imposed concurrent terms of life on Count 1, 30 years on Count 2, 20 years on Count 4 and 15 years on Count 5, and a consecutive term of 5 years on Count 6.

Pursuant to § 3D1.2(d) of the United States Sentencing Guidelines ("U.S.S.G."), Counts 1 and 2 were grouped because the offense level is determined largely on the basis of the total amount of substance involved. Count 5 was also grouped with Counts 1 and 2 pursuant to U.S.S.G. § 3D1.2(c). The base offense level for a drug offense involving at least 500 grams but less than 1.5 kilograms of cocaine base was 34. U.S.S.G. § 2D1.1(c) (2007).

The base offense level for Count 4, involving counterfeit Federal Reserve Notes, was 9. U.S.S.G. § 2B1.5(a). Higgins received a one-level enhancement because the face amount of the counterfeit items was between $2000 and $5000, U.S.S.G. § 2B1.5(b)(1)(A), resulting in an adjusted offense level of 10.

The combined offense level was calculated by assigning one Unit to the group consisting of Counts 1, 2 and 5. The offense level for Count 4 was disregarded because the offense level for that group was 9 or more levels less serious than the combined level for Counts 1, 2 and 5. Therefore, the combined offense level was 34.

Given Higgins's criminal history category of V, the guideline sentencing range ordinarily would have been 235-293 months. However, because he had two prior convictions for controlled substance offenses, Higgins qualified as a career offender under U.S.S.G. § 4B1.1. Therefore, Higgins's offense level was 37. A career offender's criminal history category is always VI, so the guideline sentencing range was 360 months-life. Moreover, pursuant to 21 U.S.C. § 841(b)(1)(A)(viii), Higgins was subject to a mandatory sentence of life imprisonment.

UNITED STATES CONSTITUTION" (ECF No. 1 at PageID 4; *see also* ECF No. 1-1 at PageID 16-38);

2.      "MOVANT DENIED EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL AS GUARANTEED BY THE FIFTH AND SIXTH AMENDMENT, U.S. CONSTITUTION" (ECF No. 1 at PageID 5; *see also* ECF No. 1-1 at PageID 38-40); and

3.      "THE PROSECUTION WITHHELD FAVORABLE EVIDENCE FROM DEFENSE DEPRIVING MOVANT OF A FAIR TRIAL AND DUE PROCESS OF LAW" (ECF No. 1 at PageID 7).

In an order issued on July 6, 2011, the Court directed the Government to respond to the § 2255 Motion.  (ECF No. 2.)  On July 11, 2011, the Government filed a Motion to Release Trial Counsel from Attorney Client Privilege.  (ECF No. 3.)[2]  On July 13, 2011, the Court directed Movant to notify the Court, within twenty days, whether he waived the attorney-client privilege.  (ECF No. 5.)  Movant did not respond.  On August 18, 2011, the Court issued an order finding an implied waiver of the attorney-client privilege.  (ECF No. 9.)

On September 30, 2011, the Government filed the United States' Response to Defendant's Pro Se Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255 ("Answer"), which included the affidavits of two of Movant's former attorneys.  (ECF No. 10.)  On October 12, 2011, the Government filed the affidavit of another of Movant's former attorneys.  (ECF No. 11.)  On February 22, 2013, Movant filed a Reply to the Government's Answer.  (ECF No. 16.)[3]

---

[2] Another copy of the motion was filed on July 12, 2011.  (ECF No. 4.)

[3] On December 26, 2012, Movant filed a motion stating that he had not received the Government's Answer and affidavits and asking for an order directing that they be served on

The Court issued an order on November 6, 2013, directing the Government to file an affidavit from Jerry Kitchen, the Assistant United States Attorney who prosecuted the case, to address plea negotiations. (ECF No. 17.) On January 13, 2014, the Government filed its Supplemental Response, which included the factual affidavit of another attorney who had represented Movant and the declaration of Jerry Kitchen. (ECF No. 24.) Movant did not file a timely supplemental reply. However, on March 10, 2014, Movant filed a document titled Judicial Notice and Request for the Right to Traverse and Respond to the Government's Supplemental Brief. (ECF No. 25.) Movant argued that he should be granted additional time to file a supplemental reply because he did not timely receive the order that was issued on July 13, 2011.

In an order issued on March 18, 2014, the Court denied leave for additional time to file a supplemental reply, stated that an evidentiary hearing would be required to resolve Movant's claim that his attorneys failed to advise him adequately about his decision to plead not guilty and risk a jury trial, and referred the matter to Magistrate Judge Bryant for possible appointment of counsel and a limited evidentiary hearing. (ECF No. 26.) Judge Bryant issued on order on March 19, 2014, directing Movant to file a financial affidavit. (ECF No. 27.) After Higgins complied with that order (ECF No. 30), Magistrate Judge Bryant appointed counsel (ECF No. 31).[4]

An evidentiary hearing was held on September 25, 2014, at which Steven E. Farese, Sr., Daniel J. Taylor, J. Colin Morris, Jerry R. Kitchen and Higgins testified. (Min. Entry, ECF No. 43; Evidentiary Hr'g Tr., ECF No. 48.) On October 1, 2014, Magistrate Judge Bryant issued an

---

him. (ECF No. 12.) The Court granted that motion on December 28, 2012 (ECF No. 13). and the Government filed a certificate of service on January 4, 2013 (ECF No. 15).

[4] Notwithstanding the Court's denial of leave to file a supplemental reply, Higgins filed a reply on March 24, 2014. (ECF No. 28.) That document will be disregarded.

R&R recommending that the Court deny relief on the claim that was the subject of the limited evidentiary hearing.  (ECF No. 44.)  Higgins filed his objections to the R&R on March 10, 2015 (ECF No. 56), and the Government filed its response to the objections on March 16, 2015 (ECF No. 57).

Higgins and each of the four attorneys who represented him prior to the entry of judgment have filed factual affidavits.  Higgins stated, in pertinent part, as follows:

> 2.    That I was originally charged in Madison County General Sessions Court related to my arrest and drug charges on September 10, 2005;
>
> 3.    That I initially hired Mr. Steven E. Farese, Sr., to represent me in State court proceedings.  We had a preliminary hearing in State court in September, 2005.  During several phone conversations with attorney Farese, I was advised that the State had yet to return an indictment against me;
>
> 4.    That on January 23, 2006, I was indicted in federal District Court on controlled substances and counterfeit obligations.  Attorney Farese could not explain why I was not indicted for firearms charges, and generally seemed unfamiliar with federal criminal court and procedures;
>
> 5.    That attorney Farese and I spoke via telephone and he never advised me as to any discernible course of action with my case, but rather kept requesting continuances telling me that the government could not go back and re-indict me for the firearm—which the government did do by superseding indictment in July of 2006.  Attorney Farese never told me about any sentencing exposure and seemed uncertain about what to do with my criminal case.  I was never offered any plea offer through attorney Farese except vague promises of leniency if I cooperated with the authorities.  Also, attorney Farese kept asking for more money while doing nothing, so I asked him to withdraw from my case, which he did;
>
> 6.    In September of 2006, I hired attorney Daniel J. Taylor to take over my federal criminal case.  Attorney Taylor was initially enthusiastic about my case and advised that the government's search warrant was not supported by probable cause because the cooperating witness (CW) was not reliable.  Attorney Taylor advised me that he would file a motion to suppress evidence and get the case dismissed.  At the time that attorney Taylor advised me about his intent to seek suppression of the evidence, he knew about the facts surrounding the CW, who was stopped in Chester County, Tennessee.  There was information about two other individuals in the vehicle with the CW.

7.      That attorney Taylor filed the motion to suppress in October of 2006 at which time AUSA Jerry R. Kitchen received a copy. Shortly thereafter, attorney Taylor's confidence completely evaporated and he told me that the government had two more CW's and that the case did not look good at that point, so attorney Taylor started to request continuances of my case. Finally, attorney Taylor told me that he wanted to abandon the suppression motion/hearing issue because of the other two CW's involved. I reminded attorney Taylor that he knew about the other two people that were with the original CW, but he became evasive and never provided any rational basis for his dramatic change in position related to the suppression issue;

8.      That attorney Taylor never conveyed any type of plea offer from the government, even though I asked him to see if the U.S. Attorney's Office would make me some sort of plea agreement offer;

9.      That attorney Taylor never told me about any mandatory life sentence applicable in my case and never mentioned my prior criminal record or how it could affect my sentence if I was found or pled guilty to the charges;

10.      That I told attorney Taylor every detail about my case and I described the circumstances prior to and after September 9, 2005, which included information about the CW and his involvement in the case;

11.      That I eventually had to ask attorney Taylor to withdraw from my case because he did not want to pursue the suppression motion/hearing issue and generally seemed uninterested in my case or helping me with it;

12.      That after retained attorney Taylor withdrew from my case, my financial circumstances would not allow me to retain private counsel, so attorney Jack Collins [sic] Morris was appointed by the Court in February of 2007;

13.      That I first met with attorney Collins [sic] months after he was appointed on April 9, 2007, at the Federal Building in Jackson, Tennessee. The meeting lasted approximately three minutes. At that time, attorney Collins apologized for not coming to see me before the April 9, 2007, court date. He went on to explain that he had not looked at my case file materials and needed more time so he would ask the Corut [sic] for a continuance. Attorney Collins assured me that he would visit me at the jail and go over all of the discovery materials and facts, and discuss the case on April 30, 2007;

14.      That attorney Morris did not come to the jail on April 30th as promised. The next time that I met with attorney Morris was on June 13, 2007, when he told me about the suppression hearing scheduled for June 19, 2007. At that time, I asked attorney Morris to re-do attorney Taylor's motion to suppress in order to address deficiencies in attorney Taylor's motion. I showed attorney Morris my pro se motion, which specifically addressed the problems that I believed were

contained in attorney Taylor's motion. Attorney Morris became agitated and told me that he knew the law and that attorney Taylor's motion was good enough. He returned my pro se motion and told me that he was the lawyer and did not appreciate my listening to jailhouse lawyers;

15.     That attorney Morris never discussed with me any plea agreements, plea offers, how much time l was facing, or go over the discovery with me to decide what sort of defense strategy we would take. Attorney Morris seemed confident that we would prevail at the suppression hearing and get the case dismissed;

16.     That I mailed my pro se motions to amend motion to suppress to attorney Morris on June 15, 2007, certified mail. I also called attorney Morris' office and advised his secretary that I had mailed the motion to attorney Morris;

17.     That on June 19, 2007, the Court held a suppression hearing. At the hearing, attorney Morris wouldn't listen to any of my suggestions for asking questions and basically told me to keep my mouth shut. I felt that attorney Morris was rude and very condescending towards me. We did not communicate well and attorney Morris obviously did not like me;

18.     That after the suppression hearing, attorney Morris told me that he would come visit me to discuss the case and the up-coming trial. Attorney Morris said that he would see me sometime between June 20-22, 2007. When attorney Morris did not come to visit me, I called his office several times and his secretary made numerous appointments for me to talk to him, but he was never in his office at scheduled times. I finally had contact with attorney Morris via phone on July 9, 2007. Attorney Morris assured me that he would come to see me to discuss the case on July 12, 2007. Attorney Morris did not show up on July 12, 2007. I did not see attorney Morris until August 7, 2007, the day before my jury trial was scheduled to begin;

19.     That on August 7, 2007, I met with attorney Morris, who advised me that the AUSA Kitchen had just given him more discovery materials that he had not yet reviewed. Up to that point, I had not seen but a few pages of "'discovery" in my case and I had never discussed the discovery material or evidence of the case with attorney Morris. During the August 7th meeting, attorney Morris told me that he was not prepared to try my case, that he had not conducted any investigation or had throughly [sic] reviewed the discovery material. I told attorney Morris that I wanted to call the CW as a witness and that I needed him to go interview the individuals associated with my case. We never discussed trial strategy or any defense to the charges. At one point, attorney Morris and I began arguing and I may have become upset with his complete indifference to my case. There was most definitely a large measure of animosity between attorney Morris and myself. I told him to tell the judge about the irreconcilable differences and conflict between us so that the judge would remove him from my case. We parted

ways on August 7th without discussing anything except the fact that we could not get along with each other;

20.     That on August 8, 2007, attorney Morris asked to address the Court and was granted permission.  Attorney Morris told the judge that he did not want to represent me, but told the judge just the opposite of what he told me by saying that he was "prepared" for the case.  Attorney Morris had just been given hundreds of pages of late disclosure that he did not review and told me less than 24 hours earlier that he was <u>not</u> prepared for my case.

21.     That I was never told by attorney Morris, or any other attorney on my case, about the government filing "851 notification," and would seek mandatory life imprisonment if I went to trial and was found guilty.  The inmates in the detention center told me about "851 Career Criminal," but I thought that was related to the firearm charge under §§ 922(g)(1) and 924(e).  When I asked attorney Morris about filing an amended suppression motion, I raised the issue of my prior drug record and he could not give me any definite answers related to such;

22.     That I should have, but was not, advised by my attorneys about the government's discovery materials and evidence, the amount of time that I was facing, and the likelihood of conviction at trial because of the evidence in absence of a discernible defense strategy.  Had I been properly advised in the first place, I could have pled guilty, got acceptance of responsibility, avoided § 851 notification, and received a sentence far less than Life imprisonment;

23.     That I never gave attorney Morris permission to tell the jury that I possessed any of the cocaine base seized from the Campbell Street apartment;

24.     That I could not communicate with attorney Morris due to the attorney-client relationship being strained by discontent and hatred between attorney Morris and myself.  When I did try to communicate with attorney Morris, he would be dismissive and not listen to my suggestions;

25.     That I believe that my criminal case was adversely affected due to the animosity between attorney Morris and myself, which caused a complete breakdown in the attorney-client relationship and deprived me of effective assistance of counsel and a fair trial;

26.     That I would have most likely pled guilty had I been offered any reasonable plea agreement and been apprised of the mandatory sentence exposure related to the controlled substances charges;

27.     That attorney Morris was relieved after I got convicted.  I hired attorney Keith Eric Golden to represent me for my sentencing and post-sentencing proceedings;

28.     That I informed attorney Golden about my complaints about my former attorneys and former counsels' failure to advise me of § 851 notification and the lack of communications with trial counsel.     I also explained to attorney Golden my filing of pro se pleadings and issues that I wanted raised at sentencing;

29.     That attorney Golden failed to raise any of the matters related to my prior attorneys' ineffectiveness or the lack of § 851 notice;

30.     That attorney Golden failed to raise any of the issues that I advised him to brief and argue on appeal.  Also, attorney Golden argued issues on appeal without first procuring the complete trial transcripts, which contained testimony in direct conflict with his arguments on appeal;

31.     That attorney Golden did not file my rehearing to the Sixth Circuit Court of Appeals as requested and he failed to file a petition for writ of certiorari[.]

(Higgins Aff., ECF No. 1-2.)

Higgins's first attorney, Steven E. Farese, Sr., filed the following affidavit:

My name is Steven E. Farese, Sr.  I have been an attorney since August of 1977.  I have been a Tennessee licensed attorney since 1984.  For the last 20 years I have primarily handled criminal defense cases in both State and Federal courts.

In approximately September of 2005 I was retained to represent Mr. Oliver Higgins in Madison County, Tennessee State Court on a drug case.  After checking each month after a preliminary hearing to see if an indictment had been rendered, Mr. Higgins was indicted in the Federal system on or about January of 2006.

Initial appearances were conducted and discovery was requested and received.  Two continuances were requested and received in order to go over the discovery, and to discuss any defenses and any proposed plea agreement.  A plea offer was received on June 7, 2006.

Besides meeting and discussing his case during and after court appearances, I met with Mr. Higgins on at least 3 occasions at FCI Mason.  Mr. Higgins was to notify me by June 30, 2006 as to his intentions as far as accepting a negotiated plea or going to trial.  I had informed Mr. Higgins that should he insist on a motion to suppress that all agreements were off and that due to his record, and the amount of the drugs alleged, he could be facing life imprisonment.

On or about July 6, 2006 I again met with Mr. Higgins at FCI Mason.  He expressed dissatisfaction with my efforts on his behalf.  Another request for continuance was made on or about July 11, 2006.  A superseding indictment was

filed on or about July 17, 2006 with a new report date being on or about July 28, 2006. Another continuance was granted for August 7, 2006 due to the superseding indictment being filed. Mr. Higgins asked for new counsel and the case was turned over to Attorney Daniel Taylor.

(Farese Aff., ECF No. 24-1.)

Daniel J. Taylor, the second attorney to represent Higgins, filed a factual affidavit that stated, in pertinent part, as follows:

1.      I was contacted with a request that I visit the Defendant to discuss representing him in the United States District Court in Jackson regarding case no 06-10004.

2.      I visited the Defendant on August 25, 2006 at the prison in Mason to discuss his case. Prior to the meeting, I obtained some materials regarding the case. I met with the Defendant for 1.5 hours and discussed his case facts and issues.

3.      I was subsequently retained on September 6, 2006 and appeared with the Defendant in court. Prior to the hearing, I met with the Defendant and discussed his case for over .5 one-half hour.

4.      I obtained the Defendant's discovery material and reviewed it during a conference with him at the prison on October 3, 2006. The conference lasted 1.9 hours and we discussed the case facts, indictment, possible penalties, and issues about possible pretrial motions.

5.      I filed a motion to suppress the search in the Defendant's case on October 23, 2006. I mailed the Defendant a copy of the motion.

6.      I met with the Defendant on November 22, 2006 at the prison in Mason. During this conference I discussed the case facts, discovery material, indictment, pre-trial issues, motion to suppress search, sentencing guidelines, lab reports, conference with the prosecutor, defendant's prior criminal history issues, and I answered several questions posed by the defendant. The conference lasted almost two hours. We discussed the strengths and weaknesses of his case and the motion to suppress in detail. We also discussed the sentencing guideline differences as to entering a guilty plea compared to going to trial.

7.      I had several conferences both in person and on the phone with Jerry Kitchen, Assistant United States Attorney who was prosecuting the Defendant. I had conferences with him on October 17, 2006 and on December 5, 2006. I informed the Defendant as to the comments made by Mr. Kitchen. One of those comments was that Mr. Kitchen was planning on enhancing the Defendant's

sentence if the Defendant chose to argue the motion to suppress and if he elected to go to trial and was convicted.

8. I met with the Defendant at the prison in Mason, TN on December 20, 2006. I discussed in detail his pretrial motion, guideline range issues, case facts and issues, prior criminal history, and the conferences and discussion that I had with Mr. Kitchen. We met for approximately 1.4 hours. The Defendant asked me several questions and made several statements. At the end of the conference the Defendant informed me that he would seek other counsel.

9. The Defendant filed a motion to dismiss me and to appoint new counsel on December 29, 2006. I attended the court hearing on the motion to dismiss on February 29, 2007. Prior to the hearing, I spoke to the Defendant for a few moments. I was relieved as counsel of record at the conclusion of the hearing. At that point I was relieved as counsel we had not argued the motion to suppress and the case still had not been set for trial. I represented the Defendant from early September 2006 until the end of December 2006. I had no dealings with the Defendant's trial or his appellate issues.

(Taylor Aff., ECF No. 10-1.)

J. Colin Morris, Higgins's third attorney, provided the following affidavit:

I was appointed to represent Oliver Higgins in the United States District Court For the Western District of Tennessee by Judge Todd. Upon appointment I was made aware that Mr. Higgins had previously retained Steve Farese as his lawyer. Subsequently, he dimissed [sic] Steve Farese as his lawyer and hired Daniel Taylor. Subsequently, Mr. Taylor was dismissed as counsel. Upon first review of the file I realized that Mr. Higgins was charged with the Intent to Distribute a large amount of cocaine base and a large amount of cocaine powder. Further, it came to my immediate attention that he was Indicted as a Convicted Felon in Possession of a Firearm in accordance with 18 U.S.C. 922g. My immediate reaction to Mr. Higgins circumstance was to contact United States Assistant Attorney, Jerry Kitchen. I asked Mr. Kitchen if he could explain possibly the problems that Mr. Higgins was had with his former two (2) lawyers. Mr. Kitchen could offer no explanation other than maybe that Mr. Higgins was apprehensive about the severity of the charges that he was Indicted for. I further asked Mr. Kitchen if there had been a Plea Offer made in this case and Mr. Kitchen informed me that there had not and that he would not be making one.

Further, upon my initial review of this matter, I learned that this incident stemmed from September 9, 2005 when the Henderson Police Department had arrested a person for a DUI and had obtained information from that person that Oliver Higgins was selling narcotics from his residence located at 1336 Campbell Street, Apt. 5, Jackson, Tennessee. At that point I realized that a Motion to Suppress the evidence in this case would be necessary. Upon further review, I

learned that Daniel Taylor had filed a Motion to Suppress and that Motion was pending with the Court. In visiting with Mr. Higgins in the West Tennessee Holding Center in Mason, Tennessee, I informed Mr. Higgins that I was going to rely on Mr. Taylor's Motion as filed. Mr. Higgins did not object at that time. Further, I explained to Mr. Higgins that to win this motion in this case would be a big deal because all of the evidence could potentially be suppressed which would have made all the difference in the world in Mr. Higgins case. I informed Mr. Higgins at that time that I was ready to argue his Motion to Suppress but at that particular time I was not ready for a jury trial. Mr. Higgins said he understood that. During the week of June 19, 2007, Mr. Higgins first voiced his discontent with how I was handling his case. I informed Mr. Higgins that I understood the apprehension based upon the penalties that he was facing. Mr. Higgins still remained discontent [sic] with my services. I never was condescending in any way to Mr. Higgins. Further, I explained to him that if we lost our Motion to Suppress that we would be left with two options. One was to enter a Guilty Plea and the other was to have a trial. I explained to Mr. Higgins that if we went to trial that he would not receive his acceptance of responsibility points. I further explained to him that if we lost at trial he could receive a life sentence. I explained to Mr. Higgins that I had been involved with several 922g cases, some of which went to trial and others which had pled. I did this in a [sic] effort to explain the difference [sic] scenarios involved with these type cases. Discussion of me changing the wording of the Motion to Suppress that Mr. Taylor had filed kept coming up. I informed Mr. Higgins that I did not think there was any reason to change the Motion that Mr. Taylor had filed so I did not. Approximately June 19, 2007 the Motion to Suppress was heard and was denied by Judge Todd.

Upon learning the Motion was denied, I solicited a plea offer from Jerry Kitchen several times and I was told that he would not be making an offer in Mr. Higgins case. I informed Mr. Higgins of this and Mr. Higgins informed me that he wanted to go to trial. I further informed Mr. Higgins of the consequences of losing at trial. We went over all of his discovery material which laid out the facts that were going to be presented to a jury and I am of the opinion that Mr. Higgins had no doubt as to the evidence against him. Upon discussing defenses with Mr. Higgins, he had asked me to let the jury know that he was not at the house when the evidence was seized, indicating to me that the jury may infer or conclude that the evidence was planted. I informed Mr. Higgins that this would probably be a long shot and he began to act as though I was working against him. On our next Court Appearance our relationship had gotten to a point to where I felt it necessary to inform Judge Todd that Mr. Higgins no longer wanted me as his Counsel. Judge Todd ruled that I would remain his Counsel. I did everything in my power to represent Mr. Oliver Higgins zealously and within the bounds of law. I did miss several appointments with Mr. Higgins due to some scheduling conflicts, however, our relationship was so strained at that point, I do not think face to face contact would have done any good. I prepared for Mr. Higgins trial as if we had never had any problems. Further, I provided Mr. Higgins with any

information concerning his case as it was provided to me. I was never disrespectful to Mr. Higgins in any way.

(Morris Aff., ECF No. 10-2.)

Keith Golden, Higgins's attorney at the sentencing hearing and on direct appeal, provided

the following affidavit:

1.      I formerly served as privately retained counsel for Oliver J. Higgins in the sentencing proceedings before this Court and the subsequent appellate proceedings in the Sixth Circuit Court of Appeals.

2.      I have been a practicing defense attorney engaged in private practice in the federal criminal law area since 1984 being duly admitted on a *Pro Hac Vice* basis in various District Courts throughout the United States. In addition, I am admitted to practice in all but three (3) of the US Circuit Courts of Appeal. Further, I have been active as a Civil Justice Act ("CJA") court appointed defense counsel in the Southern District of Ohio, Eastern Division, since 1984.

3.      Mr. Higgins claims that he was not timely notified of the Government's §851 filing is inaccurate. In fact on July 23, 2007 Mr. Higgins filed a *Pro Se* Motion to Challenge §851 Information (see Docket item #71) well prior to the start of the jury trial which began on August 8, 2007.

4.      I chose not to raise an issue relative to the §851 notice as part of the sentencing proceeding because the two (2) felonies associated thereto qualified as the requisite prior convictions contrary to Mr. Higgins' thoughts to the contrary. Additionally, the criminal history calculations in Mr. Higgins' Presentence Investigation Report ("PSR") which also determined him to be a career offender were accurate. Further, I also knew that as the Sixth Circuit held in its decision in Mr. Higgins' subsequent appeal this Court could determine that the two (2) requisite prior felony drug offenses were present for the purpose of §841 based solely on the statutory definition of the crimes as opposed to utilizing of a formal §851 finding.

5.      I chose not to raise any issues during sentencing as to Mr. Higgins' claims of ineffectiveness of prior counsel (Mr. Morris) as I felt that any potentially viable claims were based on conversations between he and Mr. Morris, which are matters outside of the record, and accordingly, are the basis solely for a §2255 Petition. Further, there was no procedure during the sentencing proceeding for me to have brought any ineffective prior counsel matters outside of the record into the record for purpose of either resolution by this Court and/or preservation for appellate review. In addition, Mr. Higgins had previously raised this issue in his *Pro Se* Motion to Reopen Suppression Hearing Due to Prejudice Caused By Counsel (see Docket item # 67) and *Pro Se* Motion For Substitution of Counsel

for Prejudice Caused By Counsel (see Docket Item # 70) both of which were denied by this Court.

6.      I did not raise an issue in Mr. Higgins' appeal as to this Court's denial of his *Pro Se* Motions as he was represented by counsel at the time of their filing and it was not reversible error for this Court to deny these *Pro Se* motions while he was represented by counsel.  Further, no appealable  issues were present.

7.      I did properly present and successfully argued an issue upon appeal for violation of Mr. Higgins' Fourth Amendment Rights in arguing that the Court erred by failing to suppress evidence seized via a search warrant.  The Sixth Circuit agreed with my argument that the warrant was not supported by probable cause but found the good faith exception applied.  Such was a finding based upon the merits, and does not indicate any ineffective representation on my part.  The Sixth Circuit did note that neither the Government nor I had discussed the good faith exception exclusion, however, to our credit, the Court opined that "there is no evidence that any circumstances are present that would negate the good faith exception."

8.      I did not raise any issue relative to the §851 notice as an issue of the appeal as I felt it was clearly not an appealable issue.

9.      I did not include in the appeal any issue as to any claims of ineffectiveness of previous counsel Morris as I felt it was not an appealable issue based on the fact that it was based on evidence outside the record.  Rather, I felt this may give rise to a future §2255 Petition.

10.     I did [not] include in the appeal any issue as to the cross examination of officer Betty [sic] Carneal as I feel it was not an appealable issue.  Given the amount of evidence and the viability of other issues raised on appeal, this was a weak and inappropriate issue to pursue.

11.     I raised each and every issue for review in Mr. Higgins appeal that I felt was viable and appropriate keeping in mind that it is not prudent appellant practice to raise each and every minor/minimal issue for review.  The prudent practice is to select a limited number of issues for appeal which are sound in fact and/or law, and further, will have an impact on the case.

12.     I did not argue any issues nor pursue any arguments that were contradictory with any trial transcripts.  In fact, I aggressively asserted a number of court decisions that while they represented the minority view, supported Mr. Higgins' argument(s).

12.[5]   I did not file a Petition for Rehearing en Banc by the Sixth Circuit because there was not any basis to do so under Federal Rule of Criminal Procedure 35. Prior to making a final decision in this regard I consulted the second opinion of other federal defense counsels with whom I have practiced for years and learned that my opinion not to file was sound.  I advised Mr. Higgins accordingly and further recommended that he focus his limited resource on a Petition for Writ of Certiorari.

13.   Notwithstanding my advice Mr. Higgins filed his own *Pro Se* Petition for Rehearing en Banc which included a request that I be relieved as his counsel.  The Sixth Circuit granted the Motion to Release me as counsel, considered the *Pro Se* Motion and then denied it.  (See Attached)  Accordingly, Mr. Higgins was not denied the opportunity to pursue a Petition for Rehearing en Banc proceeding, rather he received it and it was denied.

14.   I did not file a Petition for Writ of Certiorari before the US Supreme Court on Mr. Higgins behalf because I was no longer his counsel.  Based on his Motion to the Sixth Circuit I was formally relieved as Mr. Higgins' counsel by Court Order (See Attached).

15.   Thereafter, I was notified by Attorney Mitchell Wong of Morgon [sic] & Forster that he was working on Mr. Higgins' Petition for Writ of Certiorari on a *Pro Bono* Basis.  A Petition for Writ was filed on Mr. Higgins' behalf and a [sic] later denied by the US Supreme Court.  Accordingly, Mr. Higgins was not denied the opportunity to pursue a Petition for Writ of Certiorari, rather he received it and it was denied.

16.   I believe that my representation of Mr. Higgins at both the district and appellate court levels was clearly effective and not a "deficient performance" as characterized by Mr. Higgins.

(Golden Aff. ECF No. 11-1.)

At the Court's instruction, the prosecutor, Jerry R. Kitchen, filed the following declaration:

I am employed by the Office of the United States Attorney for the Western District of Tennessee as an Assistant United States Attorney.  In that capacity, I am responsible for prosecuting cases brought by the United States.

I was assigned to represent the United States in the case *United States v. Oliver Higgins*, No. 06-10004-JDT (Western District of Tennessee).

---

[5] Mr. Golden's affidavit contains two consecutive paragraphs numbered 12.

Upon information and belief, in late 2005, I was notified by officials of the Drug Enforcement Administration (DEA) that Oliver Higgins was arrested with over 531 grams of crack cocaine, 250 grams of cocaine, counterfeit money and a firearm during a search of his residence. Mr. Higgins qualified as a "Career Offender" and was facing a statutory mandatory sentence of life imprisonment.

Mr. Higgins was indicted by a Federal Grand Jury on January 23, 2006, and on July 31, 2006 a superseding indictment was filed.

I communicated with Mr. Higgins' first attorney, Steven Farese, Sr., a potential settlement contingent upon Mr. Higgins' cooperation with law enforcement authorities. Mr. Farese indicated that his client wanted to file a Motion to Suppress and did not want to cooperate. After several conversations with Mr. Farese, the government withdrew its offer of settlement. Mr. Higgins was later represented by Daniel Taylor and then Colin Morris.

I did not communicate a formal offer to either Mr. Taylor or Mr. Morris. Both Mr. Taylor and Mr. Morris expressed the defendant's desire to file a motion to suppress in the case, and ultimately go to trial. I made it clear to all three of Mr. Higgins' attorneys that he was facing a statutory mandatory sentence of life imprisonment.

(Kitchen Aff., ECF No. 24-2.)

At the evidentiary hearing conducted by the Magistrate Judge on September 25, 2014, Steven E. Farese, Sr. testified that ninety-five percent of his practice is criminal defense and that he has been engaged in federal criminal defense practice since 1995. (Evid. Hr'g Tr., ECF No. 48 at 12.) Farese was hired in 2005 to represent Higgins on a drug-related charge in state court in Madison County, Tennessee. (*Id.* at 13.) After a preliminary hearing, Farese "monitored the Madison County courts to see if he had been indicted. In the interim he became Federally indicated [sic]. The Feds took it up." (*Id.*) Farese testified that "I think [the charges against Higgins were] possession with intent, some conspiracy charges when the Feds took it over. And due to his records, it was a dangerous and severe case." (*Id.* at 14.) Farese elaborated:

Because of his criminal history, number one, of course, it affected his criminal history points. And because of this charge as related to the other charges either being crimes of violence or qualifying drug charges and convictions, that,

number one, his guidelines were going to skyrocket. And, number two, if the government chose to enhance, there was a possibility of a life sentence involved.

(*Id.* at 15.) In response to whether a life sentence was possible under the guidelines or whether it would have required the Government to file an enhancement, Farese replied:

It was not on the table at that time, is my recollection. My recollection is Mr. Higgins and I were discussing how high his guidelines were without the enhancement. But it was mentioned to him that, in passing almost, that, you know, this is a dangerous situation because I've seen in the past enhancements which could—the consequences being you could face life imprisonment.

But our time wasn't spent on that primarily. Our time was spent discussing what the guidelines were, and what type of deal that we could get, what our defense would be if a defense could not—if a plea deal could not be arranged, and suppression motion.

(*Id.* at 15-16.)

Farese made a request for discovery and, upon receipt of the materials, mailed a copy to Higgins. (*Id.* at 16.) Farese met with Higgins at the West Tennessee Detention Facility ("WTDF"), where he was held prior to trial, two or three times. (*Id.* at 16-17.) Farese testified that "I would have discussed the discovery—and when I say would have discussed, common practice would have dictated that—discovery with him and then the difficulties with the case." (*Id.* at 17.) Farese was asked whether the discovery materials included information about Higgins's prior convictions, and he replied:

I can't say that. Normally, my practice is to ask the defendant what his criminal history is. If he's not sure or if he says this was a misdemeanor, I will check it out. Because sometimes they're confused as to whether that's a felony or a misdemeanor. But in this case it was evident from Mr. Higgins that we had the qualifying predicate for past convictions.

(*Id.*)

After Higgins had been indicted in federal court, Farese spoke to Kitchen and received an offer to plead to one count of the indictment. According to Farese, "I can't remember if it was

conspiracy or manufacturing, but one count, or possession with intent, I can't remember. The problem with it being that his guidelines were going to be so high that he would have to cooperate." (*Id.* at 18.) "If the government felt that his cooperation reached the bar, that he could get a 5K1.1 reduction." (*Id.*) Farese communicated that offer to Higgins in person at the WTDF. (*Id.* at 18-19.) It would have been the normal practice for the Government's initial plea offer to be in writing. (*Id.* at 23.) Farese testified that, after receiving a written offer, "I would have sat down in person and gone over it with him. And if you ask me did I pull it out and go over it word for word, I can't recall. I certainly passed along what the offer was." (*Id.* at 23-24.) Higgins was unhappy that Farese could not tell him what his sentence would be if he cooperated. (*Id.* at 18.) Higgins's "response was that that's really not a deal. I would like for you to see if we could get a cap" on his potential sentence. (*Id.* at 19.) Farese conveyed that counteroffer to Kitchen, who responded "that he couldn't give a cap in this case. That his original offer stood. I told him that we may have to file a suppression and fight that issue. His response was, if you do file a suppression all deals are off." (*Id.* at 19-20.) Farese related his conversation with Kitchen to Higgins during a personal meeting. (*Id.* at 20.) Farese testified as follows:

> Mr. Higgins' response then—and again, temporally it's hard to place everything in order. His response then was that that is still not a deal. I want you to talk to these two witnesses. I remember that specifically because I reviewed my notes last night. And, you know, go with the suppression hearing.

> And I said, I don't think that is a good move. And then communications—and when I say communications, our dialogue was breaking down at that point.

(*Id.*)

Farese did not recall whether the Government had indicated at that point that they would be seeking a § 851 enhancement:

> I really can't recall that. I know that I mentioned to him—again, did not spend a great deal of time on that. I mentioned to him the danger of all deals being off. There was a possibility—I couldn't tell him that it was going to be enhanced, but I wanted him to know that that was laying out there.

> And I can't recall Mr. Kitchen telling me, well, if he doesn't take this deal we're going to enhance, if that's your question. I can't recall that.

(*Id.* at 21; *see also id.* at 28-29 (Farese did not recall that Kitchen ever said he was going to file an enhancement).) Farese agreed that the possibility of a life sentence was presented as a worst case scenario. (*Id.* at 21-22.) He did not recall whether he told Higgins that he would be facing a statutory mandatory life sentence or whether a life sentence could be imposed pursuant to the guideline calculations. (*Id.* at 22.)

In response to whether there was a deadline for Higgins to decide whether to accept the plea offer, Farese recalled that Higgins was going to give him an answer on or about July 6, 2006. (*Id.* at 24.) According to Farese, Higgins "was going to give me an answer. And I went to see him and he didn't give me an answer. His answer was to continue negotiations." (*Id.*) Farese believed that this conversation occurred near the end of his representation of Higgins, "because I believe I was dismissed in August." (*Id.* at 25.)[6] After that conversation, Farese recalled that "I came back to him again and told him that I wasn't making any headway and he needed to make a decision, because we had some decisions to make" about whether to file a motion to suppress and prepare for trial. (Evid. Hr'g Tr., ECF No. 48 at 25.) Subsequently, Higgins told Farese that he wanted to hire another attorney. (*Id.* at 27.)

Farese was asked whether he recalled a discussion of a possible plea agreement with a sentence of 188 months during a report date on the matter, and he replied:

---

[6] Farese advised the Court that Higgins intended to retain new counsel on August 7, 2006. (Crim. ECF No. 30.) He sought leave to withdraw on September 1, 2006. (Crim. ECF No. 33.)

No, I don't.  But it certainly would not have been out of the question that we had discussed getting to certain areas if the Court gave us a reduction of a certain amount of time.  That wouldn't have to be out of the question.

But I couldn't give him any specific amount of time because I didn't have any.  Could he have misinterpreted our discussions of maybe we can get to 20 years, maybe we can get to 15, maybe we can get to 12?  I don't know.  But it wouldn't have been outside of realm of practice for that to be discussed.

(*Id.* at 27-28.)  Farese did not recall the subject of any sidebar conference on July 17, 2006.  (*Id.* at 28.)

Farese did not ever file a suppression motion "[b]ecause prior to the opportunity to filing that [Higgins] wished to have another attorney."  (*Id.* at 42.)  Farese believed that "[t]hat would have been a detriment to my client to have" filed a motion to suppress.  (*Id.* at 43.)  He explained:

Because of the cost benefit analysis that I applied to it.  The benefit, of course, would be if you could suppress it maybe you could knock out the whole case.  But the odds were it was not going to be suppressed.  Although, I think he had some arguments.  I certainly think that.  I always look at the end game, and I thought it was going to be a train wreck.

(*Id.* at 20-21.)

On cross-examination, Farese testified that he had been a criminal defense attorney for over thirty years and had handled many high profile cases throughout the mid-South.  (*Id.* at 31.)  Many of those cases were in federal court, and many were drug cases.  (*Id.*)  Farese had handled many serious drug cases in which the defendant had been exposed to a possible life sentence.  (*Id.*)  Farese was familiar with 21 U.S.C. § 851, which provides for mandatory life imprisonment for certain drug crimes committed by career offenders.  (*Id.* at 31-32.)  Farese had handled several § 851 cases.  (*Id.* at 32.)

Farese testified to his practice when representing a client who might be subject to an § 851 enhancement:

I would tell him that, if this thing is enhanced, the government has the ability to request the Section 851 being applied and he would be facing life imprisonment.

Q.    And even though you can't recall specifically doing that in this case, is it likely that you did that?

A.    It would have been my common course of practice to do that. And I know a life sentence was discussed, I just can't tell you the particulars of it.

(*Id.* at 32.)

Farese had had extensive prior experience with Kitchen. (*Id.* at 33.) In his experience, Kitchen has never specified a sentence that a defendant could receive if he agreed to cooperate. (*Id.* at 34.)

Farese admitted that he had been aware of Higgins's criminal history since the outset of the case. (*Id.* at 37.) Farese agreed that Kitchen was asking him to talk to Higgins about cooperating. (*Id.* at 36, 37.) It is "[c]ommon practice" for a plea agreement to depend on a defendant's cooperation. (*Id.* at 37.) In response to what Kitchen had said to him about a plea agreement, Farese testified that

it was along the lines that if Mr. Higgins cooperated and was truthful and honest and they felt—you know, they have to feel like that, the agents have to feel like that, the Court has to accept any recommendation, but that he could be considered for a 5K1 departure.

(*Id.* at 37-38.) Farese reviewed that offer with Higgins, and he testified that there was "no question" that Higgins knew that he had the opportunity to cooperate. (*Id.* at 38.)

Farese was asked to explain his prior testimony that he could see a "train wreck" coming, and he replied:

Well, that's my terminology for bad things happening. . . . I don't think that Mr. Higgins was a bad person, I think he had done bad things. I think there are good qualifies in every human being. And I try to tell them that sometimes you have to cut your losses and bite the bullet rather than receive something down the line that you can't ever overcome.

(*Id.* at 39.)  Farese was basing his evaluation "on the evidence.  I was basing it on what my client was telling me.  I was basing it on my experience, and seeing bad things happen in these cases." (*Id.*)

Farese reviewed the evidence in the case with Higgins.  (*Id.*)  Higgins was aware that the police had found drugs in his apartment.  (*Id.* at 39-40.)  Farese recalled that "it was discussed how we could defend what was found, and what were alternative arguments without committing perjury."  (*Id.* at 40-41.)  "So the only alternative we had at that time was to see if a, in my opinion, was to see if a suppression motion would fly.  If it didn't fly, he was a dead duck."  (*Id.* at 41.)  Farese "mean[t] he was going to get convicted and could be subjected to heavy penalties."  (*Id.*)  Farese conveyed that information to Higgins because "that's my job."  (*Id.*)  Higgins knew that the police had found drugs in his apartment and that they had witnesses who would testify that he was dealing drugs out of his apartment.  (*Id.* at 41-42.)  Farese most likely explained to Higgins about his exposure to a mandatory life sentence "early on in our discussions."  (*Id.* at 42.)  Farese filed several motions for continuances in the case because "I was trying to get through to Mr. Higgins that his prospects did not look good, and I wanted him to sit and consider our chances based on our discussion and maybe he would have a change of heart."  (*Id.*)

Farese has filed many suppression motions during his career, and he has had some success with those motions.  (*Id.* at 43.)  He knows when a suppression motion has merit and when it does not.  (*Id.*)  He did not file a suppression motion in this case because "[t]hat would have been a detriment to my client to have done that."  (*Id.*)  Farese testified that "[t]he best deal would have been for [Higgins] to accept Mr. Kitchen's offer, to cooperate fully and truthfully, to receive a 5K1.1 reduction.  And again, that would have been the best of the worst, is the best

way to say it." (*Id.* at 43-44.) That did not happen because "Mr. Higgins did not wish to take

that route." (*Id.* at 44.) Farese had many conversations with Higgins in which he explained that

taking a plea deal and cooperating was his best course of action. (*Id.*) Higgins chose to reject

the plea offer, even though "[h]e knew he could get life if an enhancement followed." (*Id.*)

Farese agreed that Higgins wanted to fight the case all the way. (*Id.*)

Higgins's second attorney, Daniel J. Taylor, testified that his entire practice was criminal

defense and that he had been handling federal criminal cases since 1999. (*Id.* at 47.) Taylor first

met with Higgins on August 25, 2006. (*Id.* at 49.) Taylor recalled that

> we discussed the facts and the issues. I don't believe I had the discovery material
> at that time.
>
> And then I was retained on September 6th of 2006. And I met with him I
> guess here at this facility when he was brought in for court. And then I obtained
> his discovery material and met with him in prison after that.

(*Id.*) Taylor reviewed the discovery material with Higgins. (*Id.*)

Taylor recalled that Higgins's "primary concern" was that a motion to suppress be filed.

(*Id.* at 50.) It was Higgins who first raised the suppression issue with Taylor. (*Id.*) Taylor

continued:

> And any time I have a criminal case where there is a search or a stop,
> that's one of the first things that I always am concerned about. It's a very
> important issue. So we had a lengthy discussion once I had the discovery
> material. And before I had it—went to see the discovery material I reviewed it
> and talked with him. And then when I met with him in prison—I can't remember
> if he had a copy or I—my usual practice is to make an extra copy and bring it
> along with me to give to my client when I am first retained.
>
> But I am thinking Mr. Higgins may have already had a copy from Mr.
> Farese. And we went through it and discussed it. We discussed the issues of the
> search in detail.

(*Id.*) Taylor believed that the suppression motion was "weak," but that there was a possibility of

obtaining additional information. (*Id.* at 51.) Taylor believed it was necessary to file the motion

at that time because "we were also coming up against motion deadlines. And they're pretty strict in Federal Court." (*Id.*) He filed both a motion to extend the deadline and a motion to suppress. (*Id.* at 51-52.) Taylor characterized his decision to file the motion to suppress as "a very close call." (*Id.* at 52.)[7] Taylor testified that he shared his view about the suppression motion with Higgins:

> I did. And we talked about it. And once I filed the motion I think, I know I mailed Mr. Higgins a copy. And we went back and talked about it again. And the government filed a response to our Motion to Suppress. And I reviewed that with him also.
>
> And after reviewing that, my opinion with him is that it was not a real strong issue on the search issue, on the Motion to Suppress.

(Evid. Hr'g Tr., ECF No. 48 at 52.)

Taylor was asked whether he had had any discussions with Kitchen about the filing of a suppression motion, and he responded:

> Well, from what I recall there was some discussion when I first appeared, I think when I first appeared in court with Mr. Higgins. And I stated here in court that I was going to be his counsel, that I did talk to Mr. Kitchen. And, you know, I think at that point they had already a, superseding indictment had already been filed. And I was made aware of this issue about the career offender, you know, about the possibility.
>
> And I always tell my client, you know, Mr. Kitchen just mentioned that was a possibility. And I think from what I recall we talked about—of course, you know, we know—when you meet with your client and if you file motions, sometimes there could be, affect their acceptance of responsibility. And I explained to him if he changed his mind—if he did argue the motion and then changed his mind, he could lose a level based upon that. And I just relayed all that to my client.

(*Id.* at 52-53.)

---

[7] The docket reflects that, on September 28, 2006, Higgins filed a motion for an extension of the deadline to file pretrial motions. (Crim. ECF No. 42.) On September 29, 2006, the Court granted the motion and extended the deadline by 15 days. (Crim. ECF No. 32.) Higgins filed his motion to suppress on October 23, 2006. (Crim. ECF No. 44.)

In response to whether he had had any discussions with Kitchen about a possible plea agreement, Taylor testified as follows:

> We didn't have a definite plea agreement that we ever discussed. It was just mentioned the possibility of, you know, the government could file a motion if he decided to go on, could file the 851. And, you know, if he went on and argued it, he could lose his acceptance. But there was no proposed or no written proposed agreements. It never got to that. During my representation, it never got to that.
>
> Q. So if I understand you correctly, it was a general conversation or conversations between you and Mr. Kitchen along the lines of, the government can seek to enhance this. This might be something that maybe your client should—
>
> A. That's right.
>
> Q. But never went beyond that level of discourse. Other than maybe we should try to get this resolved, but no specific conversations as to specific sentences or—
>
> A. That's correct.
>
> Q. —whether he—or anything?
>
> A. That's correct.

(*Id.* at 54.)

Taylor was asked about the circumstances under which he withdrew from the representation, and he responded:

> I believe it was in December I believe was the last time I met with him. . . . I met with him in December of 2006. We had a long discussion about the suppression issue, the government's response, and based on that, you know, I knew that there was some concerns with Mr. Higgins. You know, he felt very strongly about the Motion to Suppress. And—
>
> Q. I'm sorry to interrupt. When you say he felt strongly about the motion—
>
> A. About pursuing it. It would be a good ground. And we talked about the strengths and weaknesses. I gave him my opinion. And we talked

about the government's response to it. I gave him my opinion. And then I asked, what do you want to do?

> And after that I was contacted. And I received something in the mail indicating that he wanted to dismiss me as counsel. And then I think that was something filed pro se. And I think the last time I met with him he indicated also that he wanted to remove me as counsel, that last meeting. And we discussed that. And I understood when I left there that he was going to try to dismiss me as counsel and retain other counsel.

(*Id.* at 54-55.) Taylor understood that Higgins "wasn't pleased with how his case was going."

(*Id.* at 55-56.) Higgins attempted to replace Taylor shortly after the discussion about the strengths and weaknesses of the motion to suppress. (*Id.* at 56.)[8]

Taylor was asked about his discussions with Higgins about the possibility of an enhancement if he pursued the motion to suppress:

> Q.    Did you advise him of the possibility of the government seeking an enhancement if he were to continue, if he were to persist in the Motion to Suppress?

> A.    Yes, we talked about that. We talked about that more than once.

> Q.    Do you have a specific recollection of whether you advised him that if the government did seek the enhancement that he would be looking at a mandatory statutory term of a life sentence?

> A.    I discussed that with him. And, in fact, I even made notes that I discussed it with him, that possibility it could be a life sentence. And I recall also looking at the prior felony conviction, and looking at them and weighing them. And even calling the Clerk's Office in Hardin County to make sure about the judgements, whether or not one or both of them were correct, and whether there were issues with them.

> And we discussed the fact that it could, the government could file a motion for a life sentence. We discussed that more than once.

(Evid. Hr'g Tr., ECF No. 48 at 56-57.)

---

[8] The docket reflects that Higgins filed a *pro se* motion to dismiss Taylor on December 29, 2006 (Crim. ECF No. 53) and that Taylor was allowed to withdraw on February 12, 2007 (Crim. ECF No. 55).

On cross-examination, Taylor testified that he had been practicing criminal law since 1992 and that his practice is entirely criminal law. (*Id.* at 57.) Taylor "started out in the State Public Defender's Office and then [he] went in private practice in '99." (*Id.*) Taylor represents criminal defendants in both state and federal court, although most of his cases are in state court. (*Id.*) He is experienced in evaluating the strengths and weaknesses of criminal cases and has tried almost ninety cases. (*Id.* at 58.)

Taylor obtained a copy of the discovery from Kitchen, which included Higgins's criminal history. (*Id.*) Taylor understood, based on Higgins's criminal history, that he could be subject to an enhancement. (*Id.* at 58-59.) Taylor also testified that "it was also relayed to me by Mr. Kitchen that that's a possibility." (*Id.* at 59.) Taylor recalled that, in his affidavit, he had stated that Kitchen had told him that he was planning on filing an enhancement if he argued the motion to suppress and went to trial. (*Id.*) According to Taylor, "I believe [Kitchen] wanted to make sure I understood that once I came in after Mr. Farese," so "[h]e just mentioned it to me." (*Id.* at 60.) Taylor did not discuss a plea agreement with Kitchen "in any detail, other than in general terms if he wanted to work something out and not argue the motion, the cooperation, those are just things that could be discussed at some time, if it ever came up to that. It was just in general terms." (*Id.* at 60.)

Taylor testified that he conveyed Kitchen's intention to file an § 851 enhancement to Higgins "because I always tell my client everything that the prosecutor or probation officer or Judge, whatever they say." (*Id.* at 60-61.) Taylor recalled that "we talked about those two options, either the option to fight and what affect it could have, and the option whether to accept the responsibility of a plea." (*Id.* at 61.) Higgins "was concerned and wanted to argue the Motion to Suppress and wanted to pursue it." (*Id.*) Taylor testified that he discussed his

sentence exposure with Higgins in every meeting they had once he had the discovery materials.

(*Id.* at 61-62.)

Taylor reiterated that, although he did not believe the suppression motion was strong, "[t]here was some possibility of an issue. Because if I didn't think there was any possibility or if it was ridiculous, I wouldn't file it." (*Id.* at 62.) Taylor was asked what his advice to Higgins had been, and he replied:

> I advised him that the Motion to Suppress was, he was probably going to lose that issue. It was extremely weak. And that there would be a consequence if he lost the motion, he would lose a level. And that if he went to trial with his prior convictions, it could result in a life sentence. And I pointed out the option to him, although I didn't have any plea offer, that, you know, it could be a lesser sentence if he didn't pursue those things.

> We talked about the strengths of the case, the drugs that were found there, the weapon that was found in his residence, the fact that he was there, the issue of the jury trial on that. I gave him my opinion of what I thought his chances would be. I couldn't guarantee him, though.

(*Id.* at 62-63.) In particular, "in Mr. Higgins' case, his issue was about whether the search of the stop—the search was proper. I told him that with a jury trial his chances would be very, very slim." (*Id.* at 63.)

Taylor testified that he had had previous cases with Kitchen. (*Id.*) In response to whether he believed Kitchen when he said he planned to file an enhancement, Taylor replied:

> Well, I've dealt with Mr. Kitchen before and he's told me he would do things or not do things. And I've found that if he told me he was going to do something or not do it, he would keep his word. He had not filed anything at the time I was relieved of counsel. But he mentioned those possibilities. And I, of course, relayed that to my client.

(*Id.* at 64.)

Taylor testified that Higgins was fully aware of the status of his case:

> Q.     . . . I guess specifically what I need to ask is if—you did not fail to advise him of his risk of a jury trial. You advised him of that, right?

A.    Yes, we discussed that.

Q.    And any plea offers, any discussion you had with Mr. Kitchen you advised Mr. Higgins, correct?

A.    Any discussion I had with the prosecutor about his case, I advised Mr. Higgins.

Q.    All right.  Mr. Higgins was aware of the evidence against him; is that correct?

A.    Because we discussed the discovery materials several times.

Q.    And he was aware of his exposure to a life sentence; is that correct?

A.    That's correct, because we discussed it I think every time once I received the discovery material.

(*Id.* at 64-65.)

Taylor recalled that, when Higgins decided to seek new counsel, "[h]e was a gentleman and he wasn't rude.  He just basically told me that he didn't agree with me and that, you know, he was going to seek other counsel."  (*Id.* at 65.)  Taylor always tried to be straight with Higgins and tell him the way that things were, and he believed that Higgins "was trying to be straight with me with what he believed."  (*Id.*)

On redirect, Taylor testified that, when he filed the discovery motion, he was aware that there were passengers in the car that had been stopped.  (*Id.* at 66.)  He testified that "I was familiar with all the informants in that situation."  (*Id.*)  He was aware that the driver was an informant, and he recalled that "we, I believe, discussed the possibility that the others could be witnesses."  (*Id.* at 67.)  During the time he represented Higgins, Taylor did not learn of any informant who had not been mentioned in the discovery material.  (*Id.*)

Higgins's third attorney, J. Colin Morris, testified that he had been practicing law since April 1993 and that seventy percent of his practice is criminal law in state and federal court. (*Id.* at 69.) After being appointed to represent Higgins in 2007, Morris received discovery, either from Kitchen or from Taylor. (*Id.* at 72.) Morris learned about Higgins's criminal history through "[c]onversations with Mr. Higgins, conversations with Mr. Kitchen, probably a combination of the two, then ultimately through records." (*Id.* at 73.) Morris did not recall whether Higgins's criminal history was included in the discovery package. (*Id.*)

Morris was aware that Higgins was facing a life sentence if he were convicted at trial because of his criminal history. (*Id.* at 73-74.) He emphasized that, "I mean, it was all about his criminal history." (*Id.* at 74.) Morris discussed that possibility with Higgins during their initial meeting, which took place at the WTDF. (*Id.* at 74-75.) He recalled that "I did my best to communicate what I thought was going on with his case. Everything about it that I could tell him or inform him of I tried to." (*Id.* at 75.)

In response to whether he had had any conversations with Kitchen about a plea prior to arguing the motion to suppress, Morris testified that "[w]e had talked about the case. And I had probably asked Mr. Kitchen if there was a way we could resolve the case. And I don't think that there was an offer made, other than plea [sic] to the indictment." (*Id.*) Morris was asked about the sentence Higgins would have faced if he had pled to the indictment:

> Well, if he pled to the indictment he could potentially have gotten three points for acceptance of responsibility. If he would have proffered, for instance if he would have been willing to tell where this decent amount of contraband came from he may have gotten some 5K1 considerations. And with all that, my calculations were that he could possibly land on a base offense level of 31. He could break out of some mandatory provisions and—I think I wrote notes down.
>
> Could have landed him on a 31 with his category V, criminal history category of V, and his numbers would have been 168 to 210.

(*Id.* at 75-76.)[9]  Morris testified that

> I think I advised Mr. Higgins that if he did not plea [sic] to the indictment he would not get any acceptance of responsibility points.  I don't know that I told him any specific numbers, other than what we were dealing with as far as criminal history was and his maximum potential.  I don't know that I gave him a number.

(Evid. Hr'g Tr., ECF No. 48 at 76.)  Morris could not recall the specifics of his conversations with Higgins, but he testified that "I think I just explained to Mr. Higgins if he were to plead and not make Mr. Kitchen have to argue the Motion to Suppress and subpoena witnesses to trial, that he would be in a better position to get a better sentence."  (*Id.* at 76-77.)

Morris believed that he discussed the merits of the motion to suppress with Higgins before arguing the motion.  (*Id.* at 77.)  Morris thought that the motion Taylor had filed was adequate.  (*Id.*)  "[I]f [Higgins] had any dispute with that, he may have brought it to my attention and ultimately he was convinced or I thought I convinced him it was the thing to do, and we went ahead with the motion as filed."  (*Id.* at 78.)

Morris was asked if he was under the impression that, if he argued the suppression motion, things were going to get worse for Higgins, and he replied:

> I suppose so.  If mean, I dealt with Mr. Kitchen for a number of years and he doesn't like to do unnecessary work.  I don't think he necessarily said he was trying to get life at that time, he just said, Colin, if you file that motion then you know that that is not what I consider accepting responsibility kind of situation.  He didn't make any life sentence type threats or nothing like that.

> His theory was that if you put him through that work—he viewed it a little differently than I did.  He thought that the search and everything was solid as a rock.  And he was always, and may still be, of the opinion that if you do that to the government then you're not accepting responsibility for your situation.  But it didn't go any further than that.

---

[9] This calculation is consistent with the PSR's calculation of the sentence Higgins would have received without the § 851 enhancement, minus three points for acceptance of responsibility.  *See supra* n.1.  Of course, by the time Morris entered the case, the motion to suppress had been filed, and the Government may have been unwilling to make a motion that Higgins receive the third point.

> Q. So if I understand you, it wasn't a, Mr. Kitchen telling you, hey, Mr. Morris, if you pursue this Motion to Suppress things are going to get a whole lot worse for your client, I'm going to seek a life sentence. It was more just your, from your experience with Mr. Kitchen and maybe some conversations that you had with him regarding this, that Mr. Higgins, if he ultimately pled guilty in the case, was certainly going to lose the acceptance of responsibility reductions that he might otherwise be eligible for if he pursued the Motion to Suppress?
>
> A. That's correct.

(*Id.* at 79-80.) Morris informed Higgins about the possibility that he could lose any credit for acceptance of responsibility. (*Id.* at 80.) He also informed Higgins of the possibility or probability that the Government would file an enhancement. (*Id.*)

Morris had conversations with Kitchen about the possibility of an enhancement, although he could not recall the content of those conversations. (*Id.*) Morris learned of the § 851 enhancement when it was filed. (*Id.* at 80-81.) Morris testified that, by the time he filed the enhancement,

> Mr. Kitchen wasn't really up for negotiations in that case any more. And Mr. Higgins and I's relationship was going south. And I was just trying to procedurally handle everything properly, knowing that my client was disgruntled with me. It was kind of a touchy situation.

(*Id.* at 81.) Morris reiterated that he believed that Kitchen had no interest in offering a plea agreement at that stage of the case. (*Id.*) Morris had never received any formal plea offer, and the only plea discussions he had had with Kitchen consisted of general statements that Higgins could plead to the indictment. (*Id.* at 82.) In response to whether he had informed Higgins about the absence of a plea offer, Morris testified:

> Well, I think I tried to negotiate with Mr. Kitchen to see if there was any way around the mandatory sentences in this case, and there wasn't. And he wasn't going to create any ways around it. And I talked to Mr. Kitchen about it more than one time. I talked with Mr. Higgins about it.

(*Id.*) Morris was asked whether he told Higgins that the life sentence would have been mandatory or only a possibility, and he replied:

> I think I informed him it was an educated guess. And at that point in time we didn't have the data to know exactly what his sentence would be. . . . But I didn't have enough data to inform him that he would get mandatory life. Presentence report hadn't been put together.
>
> I made an educated guess of what I thought the penalty ranges were. I don't think I went any further than that. He wanted to go to trial. I didn't think it was a case to try. But Judge Todd said, it's time, I'm not letting you off the case, we're ready to go. And we had a trial.

(*Id.* at 85.)

Morris did not believe that he had any discussions with Kitchen about a guilty plea during the trial. (*Id.* at 86.)

Morris recalled that he had filed a motion to withdraw at about the same time that Higgins attempted to fire him. (*Id.*) These events occurred shortly before trial, and the motions were denied. (*Id.*) In response to whether he was adequately prepared to try the case given the breakdown in his relationship with Higgins, Morris testified:

> I moved forward with the case as if Mr. Higgins and I never had any trouble. I had to block that out. And it wasn't easy to do, and we were kind of tense sitting next to each other throughout the trial. But I did my very best to do the best that I could do under the circumstances with the facts I had. That's just the way it worked out.
>
> I tried 100 percent to do the best job that I could under the circumstances.

(*Id.* at 87.)

Morris was not aware that Higgins had ever received a plea offer other than to plead to the indictment. (*Id.*) Morris admitted that he was not completely certain about what had occurred before he was appointed. (*Id.* at 89.) During his representation of Higgins, the only

plea option was a "blind plea type situation which would have been to the indictment." (*Id.* at 88.)

Morris did not recall discussing with Higgins the ramifications of the § 851 notification after it was filed. (*Id.* at 89, 90.) By that point, Morris's relationship with Higgins was "strained." (*Id.* at 89.) Morris believed that the motion had been filed two weeks before trial (*id.*), although he had no specific recollection that that was the case (*id.* at 90).[10]

On cross-examination, Morris testified that he would have gone over the statutory language of § 851 with Higgins at some point during the representation. (Evid. Hr'g Tr., ECF No. 48 at 91-92.) He clarified that "I went over the penalty, I went over his history, I went over the potential. I'm just saying that the 851 when filed, we were strained at that point and I didn't have a conversation with him about it." (*Id.* at 92.)

Morris agreed that he was the third attorney to represent Higgins and that, when he entered the case, the motion to suppress had already been filed. (*Id.*) Morris believed that the motion might have some merit. (*Id.* at 92-93.) He telephoned Kitchen, who was unwilling to make a plea offer. (*Id.* at 93.) In response to whether Kitchen also said that he was going to try to get a life sentence if he argued the motion to suppress and proceeded to trial, Morris testified:

> I can't remember if it was like that, Mr. Ivy. But it was, he's not going to get the benefit of anything that I may have to offer if he would have accepted responsibility. I can't remember if he said I will be trying to get him a life sentence. I can't remember that.

(*Id.*)

Morris was aware that Higgins could receive a life sentence, and he conveyed that information to Higgins. (*Id.* at 93-94.) Morris reviewed the evidence with Higgins. (*Id.* at 94.)

---

[10] In fact, the § 851 enhancement was filed the day before the trial began. (Crim. ECF No. 78.)

He believed that Higgins's best shot was the motion to suppress and that, if they lost the motion, the odds of success at trial were not good. (*Id.*) Morris discussed those facts with Higgins. (*Id.*) Morris recalled that Higgins never wanted to entertain any plea and always intended to go to trial. (*Id.*) In response to whether Higgins was ever going to take a plea, Morris testified:

> Not when I was representing him. We couldn't get a plea agreement worked out. And I never was given one to take to him, so we never had any choice since he didn't want to plead blind except to go to trial. And I informed him of that, you either plead blind or you go to trial.

> And it gets to a point in every criminal case, here or in State court, that you run into that inevitable situation. Either you plead to the indictment without a recommendation or with a recommendation or you go to trial. And we reached a situation where we didn't have a recommendation so we had to go to trial.

(*Id.* at 95.) Morris did not recall Higgins ever saying the amount of time he would be willing to accept to plead guilty. (*Id.* at 95-96.) Morris did not recall any conversation in which Higgins stated that he would consider pleading guilty. (*Id.* at 96.) Morris believed that it was always Higgins's intention to go to trial. (*Id.*)

After the suppression motion had been denied, Morris approached Kitchen about the possibility of a guilty plea. (*Id.* at 97.) Kitchen responded that he was not going to make an offer and was ready to try the case. (*Id.*) Because they had no plea offer and Higgins was unwilling to plead to the indictment, they had to go to trial. (*Id.*) Morris had informed Higgins, before the § 851 enhancement was filed, that he was facing a life sentence if he went to trial and lost. (*Id.*)

On further direct examination, Morris testified that there was not a possibility of obtaining a plea offer from Kitchen even before the motion to suppress. (*Id.* at 98.)

Morris testified that he met with Higgins two or three times prior to trial. (*Id.*) He did not remember the last time he met with Higgins before the trial. (*Id.* at 98-99.)

Higgins's testimony on his own behalf is completely inconsistent with that of his three attorneys. Higgins testified that any plea offer that the Government might have presented to Farese in June 2006 was not communicated to him. (*Id.* at 103-04.) Higgins was asked whether he had had any discussions with Farese about the possibility of a guilty plea, and he replied:

> It was in the Judge Todd courtroom July the 17th. Mr. Kitchen and Mr. Farese had a sidebar hearing. I don't know what was taking place in that sidebar. But after the sidebar hearing Mr. Farese came back to the table, and told me they had reached a decision. So I listened to him. And he said that they had reached 188 months to assist the government today or proceed to trial. Which he know I wasn't going to assist the government, because we already discussed that.

> But that was the only time that I ever heard a plea offer offered to me was July 17 in that courtroom after they had a sidebar meeting.

> So after that moment, after he told me proceed to trial, never was—Mr. Kitchen addressed Mr. Todd at, wanted Mr. Farese never want me to know that he would be proceeding [sic] a superseding indictment. That's why it's so vague, the first part. Because that's the only time, the same day that I was indicted, superseded because I refused that, the only offer that was ever offered to me in the courtroom that day.

(*Id.* at 104-05.) According to Higgins, he immediately told Farese that the offer was not acceptable to him:

> And I told Mr. Farese there, Mr. Farese, you already know my decision, that's not going to happen. He turned right around and tells the Judge that we proceeding to trial.

> Mr. Kitchen steps up and he say, Mr. Farese, I would like to let you and your client know that we will be seeking a superseding indictment. That's the only offer that has ever been made during the whole time Mr. Farese represented me, was July 17th.

> I have no knowledge of that June the 7th, that getting back with him in 30 days and coming out and saying we reached our decisions, we discussed that, that never happened.

(*Id.* at 108.)[11]

Higgins was asked whether he had been willing to enter into a plea agreement while

Farese was his attorney, and he replied:

> Well, I had kind of mentioned to Mr. Farese I guess maybe about three
> months before July the 17th that I take 8.  He said, I don't—he said, I know I
> can't get you 8.  He said, I'm not—
>
> . . . .
>
> . . . .  He said, I know I can't get you 8 years.  He said, I don't know what I really
> can get, but, he said, but I'll check.  That was the last of anything as far as a plea
> offer as to my part, anything else was ever mentioned again until July the 17th.

(Evid. Hr'g Tr., ECF No. 48 at 105.)  After the purported court appearance on July 17, 2006,

Higgins did not have any further discussions with Farese about plea offers.  (*Id.* at 106-07.)

Higgins also denied that he had had a discussion with Farese about a possible cap on the

sentence that could be imposed.  (*Id.* at 107-08.)

In response to whether Farese had discussed with him the sentencing range if he were

convicted, Higgins responded:

> Mr. Farese never really said anything.  Only thing I got from Mr. Farese
> during this whole period was him—he never talked to me about my case actually.
> But only thing—every time he came to me was what Jerry Kitchen wanted me to
> do.  And he felt like that Jerry felt that I had information that could supply him.
>
> And I understood what he was trying to do.  But I told him, I said, look,
> I'm facing my charges, but I'm not working with the government.  So you can
> quit asking.  But that's the only—every time he came to me this was the
> conversation.  I made that one offer out of asking him, he told me specifically that
> he could not—he know he couldn't get 8.  But other than that, there was never a
> discussion until July 17th.

---

[11] Higgins did not have a court appearance on July 17, 2006, the date the superseding
indictment was returned.  The last court appearance before the return of the superseding
indictment was on July 11, 2006.  (*See* Min. Entry, Crim. ECF No. 22.)

(*Id.* at 106; *see also id* at 107 ("But he always wanted—he came to me, Mr. Kitchen want this, Mr. Kitchen wants that. And that's all he ever came to me was what Mr. Kitchen wanted, which he know he wasn't going to get that.").)

Higgins admitted that Farese had mailed him a copy of the discovery, but he denied that Farese had reviewed it with him. (*Id.* at 109.) Higgins denied that Farese had ever told him of the possibility or likelihood that he would be facing a life sentence. (*Id.* at 109-10.) Farese never discussed his sentencing exposure with Higgins. (*Id.* at 110.) Higgins denied that Farese had discussed with him the advisability of pursuing a motion to suppress. (*Id.* at 110-11.) According to Higgins, "I understand it is common to do the things that he mentioned sitting up here today, but Mr. Farese did not do that for me." (*Id.* at 112.) Higgins emphasized that "[y]ou can ask me over and over and over about Mr. Farese, but that's the only thing that took place between me and Mr. Farese is what Mr. Kitchen wanted me to do." (*Id.* at 111.)

Higgins testified that he became interested in Taylor because a friend told him that Taylor was a fighter. (*Id.* at 113.) According to Higgins, he showed the search warrant affidavit to Taylor and Taylor told him that there was no informant. (*Id.* at 114.) Taylor told Higgins that he would be filing a motion to suppress." (*Id.*) In response to whether Taylor had discussed any consequences if the motion was unsuccessful, Higgins testified:

> Mr. Taylor never expressed to me about, as he's saying he went over about—just as I said about Mr. Farese, y'all heard one side of the story today. That I wish I had heard. If I had heard that I wouldn't be sitting here today. . . .
>
> . . . This was not, none of this that I heard in this courtroom today was conveyed to me.
>
> . . . Mr. Taylor told me what he could do if he got this. That's why he wanted to file, because there was never, not one informant.
>
> . . . I don't know what happened, but once he filed this suppression hearing, when he come back he could never look me in the eye. And that's when he told me

then where there was one informant with two other informants backing up one—one informant, two other informants backing up another informant. That he researched 15 or 20 cases, that there was no way we could win.

> I made a decision—he kept talking. I made a decision that I didn't think I could trust Mr. Taylor because all the things he been telling me from beginning was, before you got my money was that you, that there was never an informant in the beginning. Now all the sudden there is three. I couldn't trust that. I couldn't trust Mr. Taylor so I asked for him to be relieved my case.

(*Id.* at 115-16.)

Higgins testified that Taylor never told him that he might be facing a mandatory sentence of life imprisonment if he was convicted. (*Id.* at 116.) In response to whether Taylor had told him that, if he lost the suppression motion, his potential punishment could increase, Higgins testified that

> [w]e never got to that point, because when Mr. Taylor came back—the day that Mr. Taylor came by and told me that there was three—one informant with two other informants backing up that one informant, that was no way we could win the suppression hearing, I relieved Mr. Taylor that day. We never went any further. We never—before then it was all about the suppression hearing. Never if he lost or won or nothing, it was just about that it was never an informant, he got this.

(*Id.* at 117.) In short, Higgins testified that he disputed "basically everything" that Taylor had testified to "except the suppression hearing I disagree with everything, because it never—he never—for the potential time I'm facing life, or if we lose the suppression hearing, none of that never happened." (*Id.*)

Higgins recalled that his third attorney, Colin Morris, had been appointed by the Court. (*Id.*) Higgins denied that he had had any conversations with Morris about resolving his case by a guilty plea. (*Id.* at 118.) Higgins did not ask Morris whether there was any possibility of a plea agreement and did not instruct Morris to pursue a plea agreement. (*Id.*)

In response to whether he agreed with Morris that their relationship had been strained, Higgins replied, "Very much so." (*Id.*) Higgins explained that Morris did not come to see him before the first court appearance, like he said he would, and, instead, met with him in the holding cell at the courthouse. (*Id.*) At their second meeting on June 9, 2007, as they were walking down the hallway at the WTDF before they got to the conference room, "[j]ust out of the blue [Morris] said, how would you feel if you accept some time if you could beat this?" (*Id.* at 119.) Morris told Higgins, "I can beat this." (*Id.*) When they got to the conference room, Morris showed Higgins the motion to suppress that Taylor had drafted. (*Id.*) Higgins already had a copy of the motion, and he testified that "that's why I dismissed Mr. Taylor actually . . . . Because I didn't figure he had enough support in the beginning." (*Id.*) Morris told Higgins that "I think Daniel's got a good motion here" (*id.* at 120), and Higgins replied that "that's why I got rid of Mr. Taylor because the fact that I didn't think he had something, update laws that support me" (*id.*). Higgins asked Morris to read the motion that he had prepared, which he believed was better than Taylor's motion. (*Id.*) After he did so, Morris told Higgins that "I think the only one motion we need to use is Mr. Taylor's." (*Id.*) Higgins disagreed, and Morris said, "[W]ell, I'm telling you now the law." (*Id*. at 120-21.) Higgins was unhappy that Taylor's motion did not cite some recent cases, but Morris insisted that "we've got to use Mr. Taylor's." (*Id.* at 121.)

According to Higgins, Morris had told him that the motion to suppress had a very high chance of success. (*Id.* at 122.) Morris did not discuss with Higgins what might occur if the motion were not successful. (*Id.*) In response to whether Morris had told Higgins that he might be facing a life sentence if he was found guilty, Higgins testified that "[w]hen Mr. Morris left out that day we talked about the suppression hearing and the suppression hearings only. He was there probably roughly figuring, probably 30, 35 minutes at the most. That's all we discussed."

(*Id.*) There was no discussion of the sentence Higgins might receive if he were convicted. (*Id.* at 122-23.)

The motion to suppress was argued on June 19, 2007, and was subsequently denied. After that, Morris came to see Higgins in the holding cell and promised to meet with him later that day, but failed to do so. Higgins testified that Morris promised to see him several other times and did not do so. Higgins repeatedly called his office but was unable to reach Morris. (*Id.* at 123.) According to Higgins, "I knew I called at least 12 or 15 times. I spoke to him once." (*Id.*) On one occasion, Morris told Higgins that the judge had ordered him to visit Higgins and that he would be out that afternoon. Morris finally arrived at about 3:30 p.m. on the day before trial, six weeks later. (*Id*) According to Higgins, Morris "[b]rung me some more discovery, said that Mr. Kitchen had gave him six days prior to coming to see me, on June—on August the 7th." (*Id.* at 125.) At that point, Higgins told Morris that he wanted to delay the trial, and Morris replied that "Mr. Kitchen, Mr. Todd, they're not putting this off, they said they done had enough of this. He said, we're going—as admitted up here earlier, he said, we're going to go on through with this trial. He said, they done put it off long enough." (*Id.*) Morris told Higgins that he did not have time to debate whether to ask for a continuance and that he needed to go and get ready for trial. (*Id.* at 129.)

Higgins testified that he never had any discussions with Morris about resolving the case through a plea agreement. (*Id.* at 118.) Higgins never asked Morris whether a plea agreement was possible and never asked him to try to get a plea offer. (*Id.*) Higgins testified that, other than the conversation that supposedly occurred in court on July 17, 2006, none of his attorneys had had any discussions with him about a potential plea offer. (*Id.* at 130.)

In response to whether he had any interest in resolving the case through a plea when he was represented by Morris, Higgins replied that "I was really illiterate to the law, how it went." (*Id.* at 125.) He reiterated that he was "still waiting for [Morris] to come to see me so we can sit down and talk." (*Id.*) He elaborated: "As far as what [Morris] was explaining that he explained to me about the, what my potential was if I went to trial, if I lost my motion, everything that he said up here did not happen. None of that never took place." (*Id.* at 126.) Higgins insisted that, if he had known what his attorneys had testified to at the hearing,

> I wouldn't be sitting in this courtroom today. If they told me I was facing a life sentence, I know better than a life than 30 years. If they brought me—if they say what they said they told me, I'm no idiot. I would rather have 30 years, I can work on that, than a mandatory life sentence.
>
> I was misled because these lawyers said they went and talked to Mr. Kitchen about one thing, but when they talked to me it was totally different. And had I been informed of what Mr. Kitchen said that these lawyers told him, I wouldn't be sitting in this courtroom today.

(*Id.* at 126-27.) Higgins reiterated that "never from Mr. Farese, Mr. Daniel Taylor and Mr. Morris was I advised that I was facing even a life sentence. We never really got to that point . . . ." (*Id.* at 127.)

On cross-examination, Higgins admitted that he was "[v]aguely" familiar with the justice system. (*Id.* at 130-31.) He had a fairly extensive criminal history and had been in court numerous times. (*Id.* at 131.) In response to whether he knew that he could plead guilty at any time, Higgins testified that "I was ignorant to the law of what I could and couldn't do." (*Id.*) According to Higgins, "I'm aware that in any case that a guilty plea is presented to you, you can [plead guilty]. If it's presented to you, you could." (*Id.*) Higgins did not recall the judge asking him before trial if he wanted to plead guilty. (*Id.* at 132.)

Higgins testified that he remembered being brought into court after his arrest and advised of the charges, but he did not recall being advised of the potential penalties.  (*Id.*)  Higgins did not remember the Court advising him of the penalties that could be imposed on each count.  (*Id.* at 133.)  Higgins insisted that each of his lawyers was lying when he testified that he advised Higgins of the sentence he could receive.  (*Id.*)

Higgins admitted that Farese had told him that Kitchen wanted him to cooperate (*id.*), and he admitted that he was unwilling to cooperate with the Government (*id.* at 134).  According to Higgins, "I just said in my behalf I was not cooperating with, cooperating with the government.  That's on me.  As far as a plea, what they had, I don't know what else presented itself.  But as the plea that came to me, no, sir, I was not cooperating with the government."  (*Id.*)

None of his lawyers advised Higgins that he could plead guilty.  (*Id.*)  The only lawyer who discussed a guilty plea was Farese, and "[t]he only thing about pleading guilty was if I cooperated."  (*Id.*)

Higgins admitted that he had received the discovery.  (*Id.* at 135.)  He was aware that the Government was claiming that over 500 grams of crack cocaine had been found in his apartment.  (*Id.*)  He was aware of the evidence against him.  (*Id.*)

Higgins testified that his lawyers did not discuss the possibility of a § 851 enhancement with him.  (*Id.* at 138.)  Higgins admitted that he knew about § 851 enhancements "[t]hrough hearsay by inmate[s]."  (*Id.*)  Higgins filed a *pro se* motion to challenge an § 851 enhancement "on the strength of listening to an inmate that you need to file this motion before they do."  (*Id.* at 139.)  Higgins claimed that he was unaware when he went to trial that an § 851 enhancement had been filed (*id.* at 140), and he  insists that, "[h]ad I known that it was filed against me, I'd rather have a 30 year sentence than facing a mandatory—I know the difference between a 30 years

sentence and a mandatory life imprisonment.  Had I known about it you think I would have went to trial?"  (*Id.*; *see also id.* at 142 ("I would have taken a 30 year sentence and worked on that, nor a mandatory life.  What it means is, you never getting out of prison . . . .".).)  Higgins complained that neither the Court nor Morris told him that the § 851 had been filed.  (*Id.* at 141, 142.)  He admitted, however, that he filed a challenge to an enhancement because "I thought it might be filed."  (*Id.* at 141.)  He insisted that, even at the time of the evidentiary hearing, he had never received a copy of the § 851 notice.  (*Id.* at 141-42.)  Higgins reiterated that nobody, including the Court, had told him that he could get a life sentence.  (*Id.* at 143.)

On redirect, Higgins testified that, after the § 851 notice had been filed, he believed that "[i]t's normally, out of respect, that is a court-appointed date that is set for you to bring me in, for the Judge to make sure that me, as the defendant, not my lawyer, understands what an 851, representing what it means.  And that was never conveyed to me."  (*Id.* at 145.)  Higgins first learned that an § 851 enhancement had been filed at the sentencing hearing.  (*Id.* at 145-46.)  He reiterated that he would rather serve 30 years than a mandatory life sentence.  (*Id.* at 146.)

The Government called Assistant United States Attorney Jerry Kitchen, who prosecuted Higgins.  (*Id.* at 149.)  Higgins had originally been charged with two drug counts involving crack and powder cocaine and with possession of counterfeit currency.  A superseding indictment added firearm counts.  (*Id.* at 150.)  Kitchen had been aware of Higgins's prior criminal record.  (*Id.*)  Kitchen recalled that the Court advised Higgins at his initial appearance that the penalty range was ten years to life.  (*Id.* at 150-51.)

Kitchen testified that he conveyed a plea offer to Farese.  (*Id.* at 151.)  He explained:

> Initially when this case was indicted it was a very serious case and a very large quantity of crack cocaine.  And based upon that, and the law enforcement officers, we were interested in the—and one of the reasons why it was taken Federal was to induce the defendant to cooperate.  That based on his record, based

on his, the facts of the particular case, which I felt were very strong, I spoke with Mr. Farese early, as soon as he was brought into court, about his cooperation. That any plea negotiations that we were making were contingent on the defendant pleading guilty and cooperating with the government

We were interested, of course, in finding out who the defendant's source of supply was, and trying to build an investigation around that possible cooperation. I conveyed that to Mr. Farese. He asked me to send him a plea agreement, which I did.

The plea agreement was a standard plea agreement, in that the defendant was to plead guilty to Count 1 of the indictment. And there was a provision in the plea agreement about possibility of a 5K1. If the defendant cooperated, that he may potentially, if it was truthful and met all the requirements of a 5K1, that he had the option of, possibility of receiving a sentence reduction if the government made that motion.

But all—as Mr. Farese and I had discussed, that was all contingent upon the defendant being truthful and honest and providing substantial assistance.

(*Id*. at 151-53.)

Kitchen testified that Farese called him back after he had met with Higgins. (*Id.* at 153.)

According to Kitchen:

I recall stressing to Mr. Farese that time was of the essence for the defendant's cooperation. And that as in most Federal investigations, the earlier that an investigation starts in the defendant's cooperation, the better the chances are that the investigation will be successful. So I made it contingent upon Mr. Higgins agreeing to cooperate rather quickly. So I recall Mr. Farese stating he would get back to me as soon as possible.

I believe it was several weeks later or a short time later that he did contact me and indicate that the defendant was not interested in cooperating, which was the basis of me making the plea agreement. I told him then that I was going forward if the defendant—since the defendant chose not to cooperate, that I was going forward with a superseding indictment.

(*Id.* at 153-54.)

Kitchen testified that he had told defense counsel that he intended to file an § 851 enhancement:

And that it was made perfectly clear to Mr. Farese that the defendant was looking at a mandatory life sentence based upon his prior record, and that I would be filing the information prior to trial on the defendant. Mr. Farese indicated to me that he would convey this information to the defendant.

(*Id.* at 154.)

Kitchen testified that the offer he had made to Farese was the only offer that he would be making:

And as in any case, it went for a period of time that Mr. Farese didn't attempt to come back to me with proposals. I recall having those discussions with Mr. Farese, that it was all contingent upon the defendant cooperating. And he refused to cooperate, so I was not interested in presenting any new offers of any type, other than that the defendant could plead guilty as charged.

He was a career offender, if not a subject to the 851 enhancement. All these were discussions that I had with Mr. Farese. That he was looking at a mandatory minimum of at least 20 years if the information was filed, or mandatory life, excuse me, and that if he just pled guilty to the indictment that he was looking at 262 months guideline range based upon his career offender status.

So I remember having those conversations with Mr. Farese, that his range of punishment was, was discussed extensively. And that if he didn't cooperate that I was then proceeding to enhance his punishment with an 851.

(*Id.* at 154-55.)

Farese eventually told Kitchen that Higgins was not interested in cooperating and, instead, wanted to file a motion to suppress and go to trial. (*Id.* at 155.) Because Higgins had rejected his offer, which was contingent on his cooperation, Kitchen went forward with the superseding indictment. (*Id.*) Shortly afterwards, Kitchen learned that Farese had been relieved. (*Id.* at 156.)

Kitchen testified to his conversations with Higgins' second attorney, Daniel Taylor:

As I did with Mr. Farese, I informed Mr. Taylor immediately that the defendant was looking at a mandatory life sentence. This was a serious case to me. It was one of the, one of the cases where—you don't normally typically get a lot of cases where based upon the defendant's record that they qualify for a mandatory life sentence, because then you have to have a combination of two.

You have to have the defendant's record that qualifies. And in addition you have to have the amount of drugs that puts that person subject to a 10 to life range of punishment. So that two issues have to be present.

In addition, you look at the defendant's background and you see the types of offenses that he committed, and you determine whether this is someone that you would want to pursue a life sentence on. And the defendant, in my view, fit that qualifications. It was someone that if he did not choose to cooperate, that I was going to pursue a life sentence on him.

Q.     So based upon that, what did you tell Daniel Taylor?

A.     I told him that. I told him that the defendant was facing a mandatory life sentence. Mr. Taylor informed me that he wanted to pursue the Motion to Suppress, which was nothing new to me. Mr. Farese had expressed that.

But Mr. Taylor had communications with me in an effort to try to see if there was any type of possibility of this case settling in any way. And I told him that there was no plea offer that I was going to make. That I had made that and he had rejected it.

(*Id.* at 157-58.)

Kitchen also testified to his conversations with Colin Morris, Higgins's third attorney:

I spoke with Colin Morris, just as I did with Mr. Taylor, and informed him, and I believe it was in front of the defendant when we were in court, that I was going to file an 851 and that he was looking at a mandatory life sentence. Mr. Morris stated, I know, I told him.

And with these circumstances, he still went forward with the Motion to Suppress. He wanted to litigate the case. And, of course, my whole goal was, because of the strength of the case, the facts of the case, the seriousness of the case, it was to avoid any litigation. Because the case, in my view, was overwhelming as to the defendant's guilt.

And it was for that purpose that I was attempting to persuade the defendant to cooperate, that that was his only choice, and he chose not to.

(*Id.* at 158-59.)

Kitchen explained why he did not file the § 851 notice until the day before trial: "While I

informed every attorney that I was going to file it, it was not required by the statute that you file

it until the day, until prior to trial. So I filed it the day before." (*Id.* at 159.) Kitchen recalled that Higgins had filed a *pro se* challenge to any § 851 enhancement, but that the Court had declined to address *pro se* motions. (*Id.* at 159-60.)

Kitchen denied that there had been a sidebar conference where he made an offer of 188 months:

> The defendant testified that we had some sidebar conference regarding, that I made [an offer of an] 188 month sentence. That did not happen. I don't recall what the sidebar conversation was about. I know Mr. Farese attempted to try to get me to agree to some sentence, which I refused to do, other than the defendant pleading guilty as charged. And if he cooperated he was subject to a 5K1 motion, that was the best I was going to do. And that was rejected.

> The conversation with Judge Todd on sidebar, as he portrayed it, is absolutely false. That I do not recall—that may have been something that Mr. Farese was trying to get me to agree to, but that was never an offer or anything that came from me that I recall.

> . . . .

> Without—it's troubling. Without looking at the actual transcript of those hearings, I don't recall that I would have told him without him cooperating what sentence I would—I would never do that. So that I would make [an] 188 month recommendation without a defendant already cooperating and me knowing the substance of the cooperation, I can say in my history as a prosecutor, at least with the United States Attorney's Office, that I have never told a defendant what his range of punishment was going to be before they even cooperated. That would be insane.

(*Id.* at 160-61.)

In response to whether he understood that Higgins's attorneys were talking to him, Kitchen replied:

> Oh, yes. They represented to me that the defendant did not want to plead guilty, he was not going to cooperate, that he wanted to go forward with his motion, he wanted to litigate the case. And I informed them that, of what my intentions were from the very beginning to actually all three attorneys.

(*Id.* at 162.) According to Kitchen, Higgins was fully aware that he might be sentenced to life:

In fact, I do remember stating in front of the defendant with Mr. Morris that he was looking at a mandatory life sentence at one of the occasions that we were in court, but I don't recall which occasion. But I made that specific, just to make sure that Mr. Morris understood it and that I told him. Because that was something that I was very conscious of, the attorney needed to realize the severity of what the defendant was facing.

(*Id.*) It was Kitchen's understanding from the very beginning that Higgins wanted to litigate the case. (*Id.*)

On cross examination, Kitchen testified that he did not recall the Court addressing Higgins about the § 851 notice. (*Id.* at 163.)

Kitchen testified that he did not have any conversation with Morris about Higgins's potential cooperation:

At that point I was not interested in the defendant cooperating. He—just to put it bluntly, he had his opportunity when the investigation was ripe for the officers to investigate. He had—I don't know how much time had transpired between the time that Mr. Morris was appointed, but he had filed the Motion to Suppress. And as I stated earlier, my whole intent was to avoid any litigation.

. . . .

I usually, in my representation of the government, don't go back on that when the opportunity has been presented and the defendant refuses. And there was never any further discussion by any lawyer whether he wants to cooperate now, that was never discussed.

(*Id.* at 164.)

## II.     LEGAL STANDARDS

Pursuant to 28 U.S.C. § 2255(a),

[a] prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

"A prisoner seeking relief under 28 U.S.C. § 2255 must allege either (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid." *Short v. United States*, 471 F.3d 686, 691 (6th Cir. 2006) (internal quotation marks omitted).

A § 2255 motion is not a substitute for a direct appeal. *See Ray v. United States*, 721 F.3d 758, 761 (6th Cir. 2013). "[N]onconstitutional claims that could have been raised on appeal, but were not, may not be asserted in collateral proceedings." *Stone v. Powell*, 428 U.S. 465, 477 n.10 (1976). "Defendants must assert their claims in the ordinary course of trial and direct appeal." *Grant v. United States*, 72 F.3d 503, 506 (6th Cir. 1996). This rule is not absolute:

> If claims have been forfeited by virtue of ineffective assistance of counsel, then relief under § 2255 would be available subject to the standard of *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). In those rare instances where the defaulted claim is of an error not ordinarily cognizable or constitutional error, but the error is committed in a context that is so positively outrageous as to indicate a "complete miscarriage of justice," it seems to us that what is really being asserted is a violation of due process.

*Id.*

Even constitutional claims that could have been raised on direct appeal, but were not, will be barred by procedural default unless the defendant demonstrates cause and prejudice sufficient to excuse his failure to raise these issues previously. *El-Nobani v. United States*, 287 F.3d 417, 420 (6th Cir. 2002) (withdrawal of guilty plea); *Peveler v. United States*, 269 F.3d 693, 698-99 (6th Cir. 2001) (new Supreme Court decision issued during pendency of direct appeal); *Phillip v. United States*, 229 F.3d 550, 552 (6th Cir. 2000) (trial errors). Alternatively, a defendant may obtain review of a procedurally defaulted claim by demonstrating that he is "actually innocent." *Bousley v. United States*, 523 U.S. 614, 622 (1998).

"[A] § 2255 motion may not be employed to relitigate an issue that was raised and considered on direct appeal absent highly exceptional circumstances, such as an intervening change in the law." *Jones v. United States*, 178 F.3d 790, 796 (6th Cir. 1999); *see also DuPont v. United States*, 76 F.3d 108, 110 (6th Cir. 1996) (same).

After a § 2255 motion is filed, it is reviewed by the Court and, "[i]f it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion."  Rule 4(b), Rules Governing § 2255 Proceedings ("§ 2255 Rules").  "If the motion is not dismissed, the judge must order the United States attorney to file an answer, motion, or other response within a fixed time, or to take other action the judge may order."  *Id.* The movant is entitled to reply to the Government's response. Rule 5(d), § 2255 Rules.  The Court may also direct the parties to provide additional information relating to the motion.  Rule 7, § 2255 Rules.

"In reviewing a § 2255 motion in which a factual dispute arises, the habeas court must hold an evidentiary hearing to determine the truth of the petitioner's claims."  *Valentine v. United States,* 488 F.3d 325, 333 (6th Cir. 2007) (internal quotation marks omitted).  "[N]o hearing is required if the petitioner's allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact."  *Id.* (internal quotation marks omitted).  Where the judge considering the § 2255 motion also presided over the criminal case, the judge may rely on his recollection of the prior case.  *Blanton v. United States*, 94 F.3d 227, 235 (6th Cir. 1996); *see also Blackledge v. Allison*, 431 U.S. 63, 74 n.4 (1977) ("[A] motion under § 2255 is ordinarily presented to the judge who presided at the original conviction and sentencing of the prisoner.  In some cases, the judge's recollection of the events at issue may enable him summarily to dismiss a § 2255 motion . . . .").  The movant has

the burden of proving that he is entitled to relief by a preponderance of the evidence. *Pough v. United States*, 442 F.3d 959, 964 (6th Cir. 2006).

The district court has the authority to refer certain pretrial matters to a magistrate judge for resolution. 28 U.S.C. § 636(b)(1)(A). The referral may include dispositive matters such as a motion for summary judgment or a motion for injunctive relief. 28 U.S.C. § 636(b)(1)(B). When a dispositive matter is referred, however, the magistrate judge's authority only extends to issuing proposed findings of fact and recommendations for disposition, which the district court may adopt or not.

The district court has appellate jurisdiction over any decision the magistrate judge issues pursuant to such a referral. 28 U.S.C. § 636(b); Fed. R. Civ. P. 72. The standard of review applied by the district court depends on the nature of the matter the magistrate judge considers. If the magistrate judge's order addresses a dispositive motion or prisoner petition, the district court should engage in *de novo* review of all portions of the order to which specific written objections have been made. 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(b)(3); *United States Fid. & Guar. Co. v. Thomas Solvent Co.*, 955 F.2d 1085, 1088 (6th Cir. 1992).

A *de novo* review requires the reviewing court to reconsider the matter in its entirety, without granting any weight or consideration to the lower court's decision. "The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3).

## III.     ANALYSIS OF MOVANT'S CLAIMS

### A.     Ineffective Assistance of Trial Counsel (Claim 1)

In Claim 1, Higgins asserts that his trial counsel rendered ineffective assistance, in violation of the Sixth Amendment. (ECF No. 1 at PageID 4; ECF No. 1-1 at PageID 16-38.)

Specifically, Higgins complains that his trial counsel (a) failed to advise him adequately about his decision to plead not guilty and risk a jury trial (ECF No. 1-1 at PageID 16-19); (b) failed properly to investigate, research, prepare, and litigate his suppression motion (*id.* at PageID 19-22; (c) failed to challenge the defective warrant process that occurred during Tennessee state court proceedings (*id.* at PageID 23-24); (d) failed to advise him about the effect of his prior drug convictions and the enhancement notification relating to Count 1 (*id.* at PageID 24-25); (e) failed to object, or otherwise preserve for appellate review, the Court's refusal to entertain the merits of his *pro se* filings (*id.* at PageID 25-29); (f) failed to object, or properly preserve for appellate review, the complete breakdown of attorney-client relations (*id.* at PageID 29-30); (g) admitted his guilt before the jury without his consent (*id.* at PageID 31-32); (h) failed to move to disclose the identity of the informant and to investigate the informant's involvement with the case (*id.* at PageID 33-35); (i) failed to object, or otherwise preserve for appellate review, the Court's improper handling of jury notes (*id.* at PageID 35); and (j) failed to object, or otherwise preserve for appellate review, the Court's non-compliance with the requirements of 21 U.S.C. § 851 (*id.* at PageID 36-37). Higgins also argues, as sub-claim (k), that his sentencing counsel was ineffective for failing to argue, and make a record for appellate review, of previous counsel's ineffectiveness and failure to inform him of the § 851 notification. (*Id.* at PageID 37-38.)

A claim that ineffective assistance of counsel has deprived a movant of his Sixth Amendment right to counsel is controlled by the standards stated in *Strickland v. Washington*, 466 U.S. 668 (1984). To demonstrate deficient performance by counsel, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. "A court considering a claim of ineffective assistance must apply a strong presumption that counsel's representation was within the wide range of reasonable professional

assistance.  The challenger's burden is to show that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Harrington v. Richter,* 562 U.S. 86, 104 (2011) (internal quotation marks and citations omitted).

To demonstrate prejudice, a prisoner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.[12]  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.*  "It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding.  Counsel's errors must be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Richter*, 562 U.S. at 104 (internal quotation marks and citations omitted); *see also id.* at 112 ("In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. . . .  The likelihood of a different result must be substantial, not just conceivable." (citations omitted)); *Wong v. Belmontes*, 558 U.S. 15, 27 (2009) (per curiam) ("But *Strickland* does not require the State to rule out [a more favorable outcome] to prevail.  Rather, *Strickland* places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different.").

In sub-claim (a), Higgins argues that his attorneys failed to advise him adequately about his decision to plead not guilty and risk a jury trial.  (ECF No. 1-1 at PageID 16-19.)  Higgins claims that his attorneys did not spend sufficient time reviewing the discovery materials with him to enable him to make an informed decision about whether to plead guilty:

---

[12] "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant." *Id.* at 697.  If a reviewing court finds a lack of prejudice, it need not determine whether, in fact, counsel's performance was deficient. *Id.*

Although the Movant had three lawyers over a span of approximately 17 months between arraignment and trial, the combined total of time all three spent with the Movant for pretrial preparation would be less than two hours. During that time, the lawyers never produced for review any of the evidence/discovery materials. The only time that Movant was allowed to review the discovery material was on August 8, 2007—the day Movant's trial began. Prior to the first day of trial, none of the attorneys sat down with the Movant to review the discovery, explain the available defense strategies, discuss the law related to the facts/evidence of the case, or apprise the Movant as to the most prudent course of action in light of the circumstances presented by the particular case.

(*Id.* at PageID 17-18.) Higgins asserts that, if he had known the scope of the evidence the Government had against him, there is a reasonably probability that he would have pled guilty to avoid a sentence of life imprisonment. (*Id.* at PageID 18 (record citations omitted).)

In sub-claim (d), Higgins argues that his attorneys failed to advise him about the mandatory life sentence he would face if he were found guilty and the Government filed an enhancement under 21 U.S.C. § 851. (*Id.* at PageID 24-25.) According to Higgins, "[a]t no time from the day of federal charges until his trial did any of his attorney [sic], the Court, or the United States Attorney notify Movant that he would face <u>mandatory</u> life imprisonment if found guilty of the controlled substances offenses." (*Id.* at PageID 24.) Higgins alleges that, "[h]ad [he] been apprised of the serious consequences associated with taking the case to trial, there is a reasonable probability that Movant would have pursued plea negotiations or accepted a plea offer." (*Id.* at 12.)

"Defendants have a Sixth Amendment right to counsel, a right that extends to the plea-bargaining process. During plea negotiations, defendants are entitled to the effective assistance of competent counsel." *Lafler v. Cooper,* 132 S. Ct. 1376, 1384 (2012) (internal quotation marks and citations omitted); *see also Padilla v. Kentucky,* 559 U.S. 356, 373 (2010) ("In sum, we have long recognized that the negotiation of a plea bargain is a critical phase of litigation for purposes of the Sixth Amendment right to effective assistance of counsel."). "[C]laims of ineffective

assistance of counsel in the plea bargain context are governed by the two-part test set forth in *Strickland*." *Missouri v. Frye,* 132 S. Ct. 1399, 1405 (2012). These standards apply to cases, such as *Frye*, in which an attorney fails to communicate a plea offer to a defendant, and to cases, such as *Lafler,* in which an attorney's erroneous advice led a defendant to reject a plea offer.

Where, as here, a movant claims that ineffective assistance of counsel caused him to forego the opportunity to plead guilty, the standard for demonstrating prejudice is as follows:

> To show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected because of counsel's deficient performance, defendants must demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel. Defendants must also demonstrate a reasonable probability the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it, if they had the authority to exercise that discretion under state law. To establish prejudice in this instance, it is necessary to show a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time.

*Frye,* 132 S. Ct. at 1409; *see also id.* at 1410 (prejudice "requires looking . . . at . . . whether [movant] would have accepted the offer to plead pursuant to the terms earlier proposed").). "[I]f reasonable minds could conclude that a fully informed defendant would have accepted the Government's plea offer, then the defendant is entitled to relief." *Sawaf v. United States,* 570 F. App'x 544, 547 (6th Cir. 2014). "Moreover, if counsel failed to provide the defendant with an estimated range of the penalties that could result from a trial conviction, the prejudice prong is presumptively satisfied if the difference between the length of the sentence proposed in the Government's plea offer and the sentence imposed after a trial conviction is substantial." *Id.*; *see also Griffin v. United States,* 330 F.3d 733, 737-39 (6th Cir. 2003) (holding that movant was entitled to an evidentiary hearing to demonstrate prejudice where he was not notified of a plea offer and there was a large disparity between the sentence available under the offer and the sentence the movant received after trial). Where the presumption applies, a court is to apply a

"burden-shifting framework" under which "the relevant inquiry is whether the evidence conclusively supports the finding that," even if the movant had known the sentence he could receive if convicted at trial, "there is no reasonable probability that [he] would have pleaded guilty." *Sawaf,* 570 F. App'x at 548.

As a preliminary matter, the testimony at the evidentiary hearing makes clear that the three attorneys who represented Higgins prior to sentencing vigorously disputed his assertion that they failed to meet with him prior to trial, failed to review the evidence and the law, and failed to advise him of the most prudent course of action. (*See* R&R, ECF No. 44 at 1-4.) Higgins's testimony was inconsistent with that of his three attorneys. (*Id.* at 4-5.) Although the R&R did not include a factual finding about how much time Higgins's attorneys spent with him, it did conclude that the testimony of Farese, Taylor and Morris was more credible than that of Higgins. (*Id.* at 6.)[13] Even if Higgins's version of events were credited, he has not established that, if only his attorneys had spent more time with him, there is a reasonable chance he would have pled guilty. Instead, Higgins's real complaint is that, during the time he spent with his attorneys, they did not sufficiently emphasize that his best option was to plead guilty.

The R&R recommended denial of Higgins's claim that his attorneys failed to advise him adequately about whether to plead guilty, reasoning as follows:

> Based on the testimony proffered, the Magistrate Judge finds that any plea offers were relayed to Defendant by his counsel. All plea offers were contingent upon Defendant's cooperation with the government, and Defendant himself has testified that he would not cooperate. The Magistrate Judge also finds that at the time Movant chose to reject the offer and proceed with his suppression motion, he was aware of the evidence available to the Government and his exposure to a mandatory life sentence as a career offender. The Magistrate Judge finds the

---

[13] At the evidentiary hearing, Higgins admitted—contrary to his statements in his § 2255 Motion—that he had received the discovery and was aware of the evidence against him. (Evid. Hr'g Tr., ECF No. 48 at 109, 125, 135.) Higgins also admitted that a fellow inmate had told him what an § 851 enhancement was. (*Id.* at 138.)

testimony of Mr. Farese, Mr. Taylor, Mr. Morris and Mr. Kitchen credible in this regard, and does not find Defendant's testimony that he was unaware of the risk of a mandatory life sentence to be credible.

(ECF No. 44 at 6.)

Before addressing Higgins's specific objections to the R&R, it is also important to note that the testimony at the evidentiary hearing establishes that there was no possibility for the parties to have entered into a negotiated plea agreement due to Higgins's unwillingness to cooperate with the Government. Kitchen testified that he was not interested in entering into a negotiated plea agreement unless Higgins agreed to cooperate. (Evid. Hr'g Tr., ECF No. 48 at 151-53, 154 ("I recall having those discussions with Mr. Farese, that it was all contingent upon the defendant cooperating. And he refused to cooperate, so I was not interested in presenting any new offer of any type, other than that the defendant could plead guilty as charged."), 155 ("[M]y whole offer was contingent upon him cooperating, which he refused to do when he rejected that offer."), 158 ("I told [Taylor] that there was no plea offer that I was going to make. That I had made that and he had rejected it.").) By the time Morris had been appointed, Kitchen was no longer interested in securing Higgins's cooperation. (*Id.* at 163-64.) Higgins unequivocally refused to cooperate with the Government. (*Id.* at 133-34.) Even at the evidentiary hearing, years after the imposition of the mandatory life sentence, Higgins stated, "I just said in my behalf I was not cooperating with the government. That's on me." (*Id.* at 134.) Under those circumstances, no opportunity existed for a negotiated plea agreement with the Government. The only chance for a plea would have required Higgins to plead guilty to the indictment before the filing of the § 851 enhancement and without a sentencing recommendation by the Government.

In his objections to the R&R, Higgins does not urge the Court to conclude that the Government's plea offer was not communicated to him or that Farese recommended he reject it. Higgins also does not complain that his attorneys recommended that he file a motion to suppress and fight the case rather than pleading to the indictment. Tellingly, Higgins does not even dispute that his attorneys advised him that one of the possible outcomes of the case was a life sentence. Instead, Higgins argues that none of his attorneys advised him that he faced a *mandatory* life sentence if he pursued his motion to suppress or proceeded to trial. (ECF No. 56 at 2-7.) Although the objections to the R&R repeatedly emphasize that Higgins's attorneys did not stress that a life sentence would be "mandatory" (*id.* at 2, 3, 4, 5), it is important to recall that a life sentence would become mandatory only if (i) Higgins lost the motion to suppress, (ii) Higgins lost at trial, and (iii) the Government filed an § 851 notice. During the time when his attorneys were advising him on whether to plead guilty, at least two of those three eventualities had not yet occurred. Higgins also has provided no legal support for the proposition that an attorney's conduct is deficient when he provides his client with accurate information and recommends that he plead guilty yet the client refuses to do so, either because he disagrees with the lawyer's evaluation of the strength of the case or he has not focused on the worst-case scenario his attorney has warned him about.

Higgins was aware from the outset of the case that a life sentence was at least a possibility. The penalty copy of the indictment provides that the maximum sentence on Counts 1 and 2 was life if Higgins had previous convictions. (No. 06-10004-JDT, ECF No. 3 at PageID 10, 11.) Higgins was also advised during his initial appearance that the maximum sentence he could face was life imprisonment. (ECF No. 44, at 5 & n.2.) Farese, Taylor and Morris each testified that they advised Higgins that he could be sentenced to life. (*Id.* at 2-4.) Higgins does

not challenge the Magistrate Judge's factual finding that the testimony of Farese, Taylor, Morris and Kitchen was more credible than his testimony. (*See id.* at 6.) It is undisputed, therefore, that each of Higgins's attorneys advised him that a life sentence was at least a possibility. (ECF No. 56 at 3-5.) Had avoiding a life sentence been as important to Higgins as he now claims, it is difficult to understand why he did not discuss with his attorneys how that outcome could have been avoided.

Higgins has cherry-picked the testimony of his attorneys to suggest that he was not advised of the risks of proceeding with the suppression motion and a trial. Farese testified that he obtained discovery from the Government and discussed with Higgins the advisability of pleading guilty and the defense strategy in the event a plea agreement could not be reached. (Evid. Hr'g Tr., ECF No. 48 at 15-17, 40-41.) Farese reviewed the evidence with Higgins. (*Id.* at 39; *see also id.* at 39-40 (same).) The only alternative to a guilty plea, in Farese's view, "was to see if a suppression motion would fly. If it didn't fly, he was a dead duck." (*Id.* at 41.) Farese clarified that "I mean he was going to get convicted and could be subjected to severe penalties." (*Id.*) Farese obtained several continuances because he "was trying to get through to Mr. Higgins that his prospects did not look good, and I wanted him to sit and consider our chances based on our discussion and maybe he would have a change of heart." (*Id.* at 42.)

Farese testified that he was aware of Higgins's criminal record from the outset of the case and he was aware that an § 851 enhancement was a possibility. (*Id.* at 15, 38.) Farese believed it is likely that he warned Higgins of the possibility that the Government might seek an § 851 enhancement (*id.* at 32-33), which would expose him to a mandatory life sentence (*id.* at 42). According to Farese, that would have occurred "early on in our discussions." (*Id.*)

Farese went over the Government's plea offer with Higgins. (*Id.* at 23-24.) He testified that he had many conversations with Higgins about the advisability of accepting a plea offer. (*Id.* at 44.) Farese concluded that Higgins "knew he could get life if an enhancement followed" but he wanted to fight the case all the way. (*Id.* at 44.) That Farese might have used the word "could" rather than "will" in his various conversations with Higgins does not establish that "he never discussed the mandatory nature of the life sentence." (ECF No. 56 at 3.)

Taylor testified that he discussed the facts of the case and the issues with Higgins before he was retained. (Evid. Hr'g Tr., ECF No. 48 at 49.) He subsequently reviewed the discovery materials with Higgins. (*Id.*) Taylor and Higgins discussed the legal issues arising from the search in detail. (*Id.* at 50.) Taylor advised Higgins that the motion to suppress was not strong. (*Id.* at 52, 63.) According to Taylor, "[w]e talked about the strength of the case, the drugs that were found [in Higgins' apartment], the weapon that was found in his residence, the fact that he was there, the issue of the jury trial on that. I gave him my opinion of what I thought his chances would be." (*Id.* at 63.) Taylor also advised Higgins about his conversations with Kitchen, including the possibility that an enhancement might be filed. (*Id.* at 52-53, 60-61.) According to Taylor, he advised Higgins that the Government might file an enhancement if he pursued the motion to suppress. (*Id.* at 56-57, 61.) Taylor also discussed his sentencing exposure with Higgins at every meeting they had after Taylor received the discovery materials. (*Id.* at 61-62.) Taylor believed that Higgins was fully aware of the strengths and weaknesses of the case, including his potential exposure to a life sentence. (*Id.* at 64-65.) Again, although Taylor may not have said that a life sentence would be "mandatory," he informed Higgins that the motion to suppress was weak, that the case against him was strong, and that he could receive a life sentence if the Government filed an § 851 notice.

Morris testified that he was aware of Higgins's criminal history and that he discussed the possibility of a life sentence during his first meeting with Higgins. (*Id.* at 73-75.) Morris advised Higgins about the advisability of pleading to the indictment. (*Id.* at 76.) He discussed with Higgins the advantages to entering a guilty plea over arguing the motion to suppress and proceeding to trial. (*Id.* at 76-77.) Morris discussed the merits of the motion to suppress with Higgins prior to arguing the motion. (*Id.* at 77.) He warned Higgins that, if he argued the motion, Higgins might lose credit for acceptance of responsibility if he later chose to plead guilty. (*Id.* at 80.) Morris also discussed the possibility or probability that the Government would file an enhancement. (*Id.*) Morris advised Higgins of his belief that he would be subject to a life sentence if he were convicted. (*Id.* at 85, 97; *see also id.* at 92 ("I went over the penalty, I went over his history, I went over the potential.").) Given that testimony, and that of Farese and Taylor, Higgins had more than enough notice of the potential of a life sentence to enable him to evaluate the advisability of a guilty plea.[14]

The R&R notes that Higgins testified that "inmates did tell him about the possibility of the enhancement, and that is why he prepared a motion to challenge . . . ." (ECF No. 44 at 5.) In his objections, Higgins insists that the fact that he filed a *pro se* challenge to an § 851 enhancement does not establish that he knew that a life sentence would be mandatory. (ECF No. 56 at 7.) That argument is not persuasive. Higgins's filing of a challenge to a potential § 851 enhancement establishes that he was aware of the statute and knew that he likely qualified as a career offender. Higgins's action is entirely consistent with the testimony of his attorneys that

---

[14] It is undisputed that Morris did not alert Higgins to the fact that the Government had filed its § 851 notice on the day before the trial. Higgins makes no argument that, if he had entered a plea to the indictment at that time, he would have been able to avoid a life sentence.

they discussed with Higgins the possibility of the Government filing an § 851 enhancement and that, if it did so, he could be sentenced to life.

For all the foregoing reasons, the Court HOLDS that the deficient performance prong of sub-claims (a) and (d) has not been satisfied.

With respect to the prejudice prong, Higgins insists that, but for his attorneys' failure to advise him of the enhancement and the mandatory nature of the life sentence, he would have pled guilty to the indictment. (*Id.* at 7-8.) Although Higgins has recited the standard for demonstrating prejudice, that standard cannot be applied in the ordinary manner because Higgins's claim of deficient performance differs from the usual case in which a prisoner fails to accept a plea. In this case, Higgins does not claim that his attorneys failed to communicate a plea offer. Higgins also does not claim that his attorneys gave an erroneous estimate of his potential sentence or urged him to reject a plea and fight the charges. The objections to the R&R do not dispute the Magistrate Judge's findings that Higgins was advised that his best course was to plead guilty and that, if he did not, he was likely to be convicted and might be sentenced to life. If a purely objective standard were applied in this case, prejudice might be established because a reasonable defendant in Higgins's situation would have pled to the indictment. There is every reason to believe, however, that Higgins was unlikely to have pled to the indictment without a sentencing recommendation no matter what his attorneys told him.

First, this is not a case in which a prisoner rejects a favorable plea agreement and is convicted and sentenced to a much longer term. Kitchen testified that, if Higgins had pled guilty to the indictment, his guideline sentence would have been 262 months, or 21 years 10 months.

(Evid. Hr'g Tr., ECF No. 48 at 154.)[15]  At the time of sentencing, Higgins was 50 years old.  At best, then, if he pled guilty Higgins could expect to be released when he is approximately 70 years old.  The difference between being released at that age and a mandatory term of life imprisonment is not so great that any reasonable defendant would have foregone the opportunity to pursue a motion to suppress.

Second, there is every reason to believe that Higgins would not have agreed to plead to the indictment.  Higgins fired three attorneys who advised him that his best course of action was to plead guilty.  Each of Higgins's attorneys testified that Higgins never wanted to accept a plea and, instead, wanted to fight the charges.  (Evid. Hr'g Tr., ECF No. 48 at 43-44, 54-56, 64-65, 94-96.)  Higgins was unhappy that the Government's plea offer did not specify the sentence he would receive.  (*Id.* at 18-19.)  Higgins testified that he rejected a plea offer of 188 months that would have required him to cooperate and that, at one point, he offered to plead guilty in exchange for a sentence of eight years.  (*Id.* at 104-05.)  In light of Higgins's statements and actions throughout the criminal case, it is not credible that Higgins would have pled to the indictment if only his attorneys had sufficiently stressed to him that a life sentence would be "mandatory."

For all the foregoing reasons, sub-claims (a) and (d) are without merit.

In sub-claim (b), Higgins complains that his attorneys failed properly to investigate, research, prepare and litigate his suppression motion.  (ECF No. 1-1 at PageID 19-22.)  Specifically, Higgins complains that Morris (i) "did not amend/supplement or otherwise add to Attorney Taylor's boilerplate-type motion and went on with the evidentiary hearing without first

---

[15]  Morris's estimate of 168-210 (*see id.* at 75-76) months assumes that Higgins cooperated and obtained a § 5K1.1 reduction or that he received the full reduction for acceptance of responsibility.  *See supra* n.8.

consulting with the Movant" (*id.* at PageID 19-20); (ii) "failed to properly argue that the government's circumstances supporting probable cause were not legally sufficient facts to establish the informant's reliability or provide probable cause" (*id.* at PageID 20 (emphasis omitted)); (iii) "lacked the legal knowledge" to challenge the Government's attempts to establish probable cause (*id.* at PageID 20-21); and (iv) "never brought to the District Court's attention the complete lack of connection between what occurred between the confidential informant and the inside of Higgins's apartment" (*id.* at PageID 21). Higgins also complains that Morris "failed to seek reopening of the suppression hearing as requested by the Movant." (*Id.* at PageID 19.)

Higgins challenged the denial of the motion to suppress on direct appeal, and the Sixth Circuit rejected this claim on the merits, reasoning as follows:

> "When reviewing a district court's decision on a motion to suppress, we use a mixed standard of review: we review findings of fact for clear error and conclusions of law de novo." *United States v. Davis*, 514 F.3d 596, 607 (6th Cir. 2008). The district court's finding that there was probable cause to support the warrant is reviewed de novo. *United States v. Hardin*, 539 F.3d 404, 416–17 (6th Cir. 2008). We view the evidence "in the light most likely to support the district court's decision." *Davis*, 514 F.3d at 607 (internal quotation marks omitted). "An issuing judge's findings of probable cause should be given great deference by the reviewing court and should not be reversed unless arbitrarily exercised." *United States v. Miller*, 314 F.3d 265, 268 (6th Cir. 2002), *cert. denied*, 539 U.S. 908, 123 S. Ct. 2261, 156 L. Ed. 2d 121 (2003). "'[A] denial of a motion to suppress will be affirmed on appeal if the district court's conclusion can be justified for any reason.'" *Hardin*, 539 F.3d at 417 (quoting *United States v. Pasquarille*, 20 F.3d 682, 685 (6th Cir.1994)).

> . . . .

> The Fourth Amendment requires that a warrant must be supported by probable cause, i.e., "a fair probability that contraband or evidence of a crime will be found in a particular place." *Miller*, 314 F.3d at 268 (internal quotation marks omitted). The Supreme Court has held that the sufficiency of a warrant is analyzed using a totality-of-the-circumstances approach; "the duty of a reviewing court is simply to ensure that the [issuing] magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed." Illinois v. Gates, 462 U.S. 213, 238–39, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983) (quoting *Jones v. United States*, 362 U.S. 257, 271, 80 S. Ct. 725, 4 L. Ed. 2d 697 (1960)). When a search warrant

issues based on an informant's tip, that informant's "'veracity,' 'reliability,' and 'basis of knowledge' are all highly relevant," but are not "separate and independent requirements to be rigidly exacted in every case." *Id.* at 230, 103 S. Ct. 2317. In applying this totality-of-the-circumstances test, this court has held that "where a known person, named to the magistrate, to whose reliability an officer attests with some detail, states that he has seen a particular crime and particular evidence, in the recent past, a neutral and detached magistrate may believe that evidence of a crime will be found." *United States v. Allen*, 211 F.3d 970, 976 (6th Cir. 2000) (en banc).

As in *Allen*, in Higgins's case, the affidavit was based on information provided to law-enforcement officers by an informant who was known to the affiant and whose name was disclosed to the issuing magistrate. *See Allen*, 211 F.3d at 971–72. However, Higgins's case is different from *Allen* in two critical respects. First, unlike the affidavit in *Allen*, Carneal's affidavit did not attest to the informant's reliability. The Supreme Court has held that "[a]dmissions of crime, like admissions against proprietary interests, carry their own indicia of credibility—sufficient at least to support a finding of probable cause to search." *United States v. Harris*, 403 U.S. 573, 583, 91 S. Ct. 2075, 29 L. Ed. 2d 723 (1971). However, when considering *Harris*, this court has held that "[a]n admission against penal interest ... is a significant, and sometimes conclusive, reason for crediting the statements of an informant." *Armour v. Salisbury*, 492 F.2d 1032, 1035 (6th Cir. 1974) (emphasis added). Accordingly, the fact that the informant was known to the affiant and issuing magistrate and admitted a crime does not alone provide probable cause. In addition to providing scant information about the informant's reliability, the "corroboration" included in Carneal's affidavit does little to reinforce the informant's assertions. The affidavit states that the other passengers in the car confirmed the informant's statement, but it does not say whether they did so unprompted or if the police asked them whether the drugs had come from Higgins's apartment. The affidavit states that the police corroborated the fact that Higgins lived at the stated location, owned the motorcycle parked outside, and had a drug-related criminal history, but none of these facts supports the informant's assertion that he had purchased drugs from Higgins at this location the previous day.

The second difference between this case and *Allen* is that this affidavit does not assert that the informant had been inside Higgins's apartment, that he had ever seen drugs or other evidence inside Higgins's apartment, or that he had seen any evidence of a crime other than the one that occurred when Higgins allegedly sold him drugs. Without such an assertion, the affidavit fails to establish the necessary "nexus between the place to be searched and the evidence sought." *United States v. Van Shutters*, 163 F.3d 331, 336–37 (6th Cir. 1998) (internal quotation marks omitted), *cert. denied*, 526 U.S. 1077, 119 S. Ct. 1480, 143 L. Ed. 2d 563 (1999).

Applying the totality-of-the-circumstances test, we hold that this warrant was not supported by probable cause. The informant gave his statements after the police discovered a large amount of drugs in his car, giving him an incentive to cooperate with the police to help himself. The affidavit contains no assertion that this informant is known to be reliable, nor did the police corroborate any of the informant's statements beyond the innocent fact that Higgins lived at the stated location and the irrelevant (to the determination of whether Higgins's house contained evidence of a present-day crime) fact that Higgins had a criminal record. Nor does the affidavit contain any assertion that the informant had been inside Higgins's apartment or that the informant had seen drugs or other evidence in or around Higgins's apartment. Given these weaknesses, we conclude that the district court erred in its conclusion that this warrant was supported by probable cause.

. . . .

In light of two judges on this panel having concluded that the warrant was not supported by probable cause, we must next determine whether an exception to the exclusionary rule applies. "In *United States v. Leon*, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984), the Supreme Court created a good-faith exception to the usual rule that courts should exclude evidence obtained in violation of the Fourth Amendment" which this court has described as follows:

> *United States v. Leon* modified the exclusionary rule so as not to bar from admission evidence seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective. Where an officer's reliance on a warrant is objectively reasonable, the Supreme Court held, no additional deterrent effect will be achieved through the exclusion from evidence of the fruits of that search. However, the good-faith exception is inapposite in four situations: (1) where the issuing magistrate was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth; (2) where the issuing magistrate wholly abandoned his judicial role and failed to act in a neutral and detached fashion, serving merely as a rubber stamp for the police; (3) where the affidavit was nothing more than a "bare bones" affidavit that did not provide the magistrate with a substantial basis for determining the existence of probable cause, or where the affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where the officer's reliance on the warrant was not in good faith or objectively reasonable, such as where the warrant is facially deficient.

*United States v. Rice*, 478 F.3d 704, 711–12 (6th Cir. 2007) (internal quotation marks and citations omitted); *see also Herring v. United States*, 555 U.S. 135, 129 S. Ct. 695, 172 L. Ed. 2d 496 (2009).

Although a majority holds in Part II.A.2.a that this warrant was not supported by probable cause, a separate majority holds that the *Leon* good-faith exception applies and makes exclusion an inappropriate remedy in this case. Neither party discusses the issue, but there is no evidence that any circumstances are present that would negate the good-faith exception. There is no evidence that Carneal included false information in the affidavit; there is no evidence that the magistrate acted as a partisan rubber stamp; the affidavit is weak, but it is not bare bones, and this court's precedents are not so clear as to make it "entirely unreasonable" to find probable cause based on such an affidavit; and there has been no showing that the warrant was so obviously deficient that official reliance on it was objectively unreasonable.

"[O]ur good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 922 n.23. The conclusion that the officers' reliance on the warrant was objectively reasonable requires "'a less demanding showing than the "substantial basis" threshold required to prove the existence of probable cause.'" *United States v. Carpenter*, 360 F.3d 591, 595 (6th Cir. 2004) (en banc) (quoting *United States v. Bynum*, 293 F.3d 192, 195 (4th Cir. 2002)). In this case, the police had received information from a named informant who, in the course of admitting that he had committed a crime, told police that he had purchased drugs from Higgins's address earlier that day. As discussed above, the police had not worked with the informant before and did not know whether drugs had been sold or seen inside Higgins's residence, but a magistrate did issue a warrant based on the facts included in the affidavit. This circuit's holdings indicate that a nexus between the place to be searched and the item to be seized may sometimes be inferred. *See United States v. Williams*, 544 F.3d 683 (6th Cir. 2008). Here the warrant contained a sufficient link between Higgins's home and drug activity such that a reasonably well-trained officer would not have known that the search was illegal. *See Carpenter*, 360 F.3d at 596. Accordingly, we conclude that exclusion is inappropriate and the evidence stemming from the search should not be suppressed.

*United States v. Higgins,* 557 F.3d at 389-91.

Even if Higgins were correct that Morris failed to properly analyze the suppression issue, the Sixth Circuit's decision makes clear that he suffered no prejudice because the *Leon* good-faith exception applies. *United States v. Soto,* 780 F.3d 689, 699 (6th Cir. 2015) ("Soto cannot show prejudice if the evidence was admissible under the good-faith exception to the Fourth Amendment's warrant requirement."). Higgins is not entitled to relitigate that conclusion in his

§ 2255 motion.  *See supra* p. 55.  Higgins's motion also fails to state what his attorney could have done to avoid the good-faith exception.  Therefore, sub-claim (b) is without merit.

In subclaim (c), Higgins complains that his attorneys failed to challenge the defective warrant process during Tennessee state court proceedings.  (ECF No. 1-1 at PageID 23-24.) Specifically, Higgins asserts, without elaboration, that "the Tennessee State laws were not followed with respect to the search and arrest warrants related to Movant's criminal case" (*id.* at PageID 23) and that, if defense counsel had raised the issue, "there is a reasonable probability that the federal [court] would have ruled that all evidence seized by Tennessee State officers during search of Movant's residence was inadmissible" (*id.* at PageID 23-24).

Higgins's presentation of subclaim (c) does not comply with Rule 2(b) of the § 2255 Rules, which requires, *inter alia*, that the motion must "specify all the grounds for relief available to the moving party"and "state the facts supporting each ground . . . ."  Rule 2(b)(1)-(2), § 2255 Rules.  Higgins has not identified the manner in which the search warrant failed to comply with Tennessee law.

Even if that were not the case, a federal court is not required to exclude evidence that is obtained in violation of state law:

> "The commonly-held position is that federal, not state, law governs the question of the validity of a [state-issued] search warrant in a federal criminal proceeding."  *United States v. Shields*, 978 F.2d 943, 945 (6th Cir. 1992); *accord United States v. Clyburn*, 24 F.3d 613, 614 (4th Cir. 1994) ("[T]he validity of a search warrant obtained by state officers is to be tested by the requirements of the Fourth Amendment of the U.S. Constitution, not by state law standards, when the admissibility of evidence in federal court is at issue.").  Similarly, "in federal court, [the exclusionary rule] only requires the court to exclude evidence seized in violation of the Federal Constitution."  *United States v. Wright*, 16 F.3d 1429, 1434 (6th Cir. 1994).  That is because the exclusionary rule "emanates from the Fourth Amendment, not state law[.]"  *Id.*  While the states are free to impose rules for searches and seizures that are more restrictive than the Fourth Amendment, those rules will not be enforced in a federal criminal proceeding.  *Id.*  Therefore, "[i]n determining whether evidence obtained solely by state officers is admissible

in federal court in the first instance, it is usually irrelevant whether a state rule of criminal procedure was violated." *United States v. Maholy*, 1 F.3d 718, 721 (8th Cir. 1993); *see also Virginia v. Moore*, 553 U.S. 164, 178, 128 S. Ct. 1598, 170 L. Ed. 2d 559 (2008) (noting that "it is not the province of the Fourth Amendment to enforce state law"). This rule "promotes uniformity in federal prosecutions." *Wright*, 16 F.3d at 1437.

*United States v. Beals,* 698 F.3d 248, 263-64 (6th Cir. 2012); *see also id.* at 264 ("[O]nly the Fourth Amendment (to the exclusion of state law) applies in federal prosecutions involving evidence seized by state officials. So long as the Fourth Amendment is satisfied, there is no basis for suppression." (emphasis omitted)); *United States v. Franklin,* 284 F. App'x 266, 269 (6th Cir. 2008) (same).

Sub-claim (c) is without merit.

In sub-claim (e), Higgins complains that his attorneys failed to object, or otherwise preserve for appellate review, the merits of his *pro se* filings. (ECF No. 1-1 at PageID 25-29.) Specifically, Higgins complains that he was required to file a *pro se* motion to reopen the suppression hearing and an amended motion to suppress. (*Id.* at PageID 26.) Higgins also avers that he "had no alternative but to put the District Court on notice of the problems between counsel and the Movant related to the suppression motion/hearing issues specifically and ineffective assistance of counsel generally." (*Id.*) Higgins complains that the Court summarily denied his *pro se* motions on the ground that a person who is represented by counsel cannot make *pro se* filings. (*See* ECF No. 69.)

Higgins's presentation of sub-claim (e) is confusing because he does not specify what, if anything, his attorney should have done. Instead, he takes issue with the Court's failure to infer from the existence of *pro se* filings that there had been a serious breakdown in the attorney-client relationship. (ECF No. 1-1 at PageID 25-29.) The Court's handling of Higgins's attempt to have Morris relieved will be addressed *infra* in connection with sub-claim (f).

To the extent Higgins contends that Morris was ineffective in failing to adopt the arguments in his amended motion to suppress and his motion to reopen the suppression motion, he has failed to show prejudice for the reasons previously stated with respect to sub-claim (b). *See supra* p. 72.

To the extent Higgins argues that Morris was ineffective in failing to challenge the Court's refusal to address *pro se* filings, he cannot establish either deficient performance or prejudice. The law is clear that persons who are represented by counsel are not entitled to file *pro se* motions. *See, e.g., United States v. Montgomery,* 592 F. App'x 411, 415-16 (6th Cir. 2014) (defendant whose attorney filed appellate brief not entitled to also file *pro se* brief); *United States v. Mosely,* 810 F.2d 93, 97-98 (6th Cir. 1987) (district court has discretion to disallow a party who is represented by counsel from also making *pro se* filings); *United States v. Hills,* No. 12-12254, 2014 WL 1400815, at *2 (E.D. Mich. Apr. 9, 2014) ("Since Hills has counsel, and is seeking new counsel on appeal, Hills is attempting to proceed in a 'hybrid' fashion, both through his counsel and *pro se* by way of his motion. Although the Sixth Amendment guarantees defendants the right to conduct their own defense and even represent themselves, the right of self-representation does not include the right to proceed in a hybrid manner." (citations omitted)).

Sub-claim (e) is without merit.

In sub-claim (f), Higgins complains that Morris failed to object and properly preserve for appellate review the complete breakdown in attorney-client relations. (ECF No. 1-1 at PageID 29-30.) Higgins explained:

> Although Movant filed pro se motions in which he complained about counsel's lack of effectiveness, attorney Morris did not even attempt to make a record as to the hostility between himself and the Movant, nor did counsel provide an effective argument in law or fact to justify his removal from Movant's criminal

case. Movant was not adequately communicating with counsel because counsel ridiculed Movant's positions on the law and how the case should be defended. When given the opportunity to make a record and argument for being relieved due to the conflict between counsel and client, attorney Morris could only say that he did not want to represent Movant.

(*Id.* at PageID 29.) According to Higgins,

[t]he irreconcilable conflict between Movant and attorney Morris may have begun as a disagreement about strategy and how Movant's case should proceed; however, the conflict turned personal and progressed into implacable enmity which ultimately destroyed the attorney-client relationship between the Movant and attorney Morris.

(*Id.* at PageID 30.) As a result, Morris "rudely dismissed" Higgins and refused to ask questions that he wanted asked of Billy Carneal. (*Id.*) Morris also "simply ignored" Higgins when he attempted to get him to ask certain questions of DEA Agent Terry Hopper. (*Id.*)

The criminal docket reflects that, on July 31, 2007, eight days before the trial was scheduled to being, Morris filed a motion seeking leave to withdraw in which he stated that Higgins was not satisfied with the outcome of the motion to suppress, that he had filed a *pro se* motion to dismiss counsel, and that, "due to communication problems that have arisen it would be prejudicial to Defendant, Oliver Higgins, for counsel to continue representing him." (No. 06-10004-JDT, ECF No. 75 at 1-2.) Higgins's *pro se* motion for substitution of counsel, which had been filed on July 19, 2007, set out in detail his reasons for wanting a new attorney. (No. 06-10004-JDT, ECF No. 70.) The Court summarily denied those motions on August 2, 2007, reasoning as follows:

Mr. Morris is the third attorney to represent the Defendant in this case. Defendant's first attorney, Steven E. Farese, Sr., was granted permission to withdraw on September 11, 2006 due to "certain philosophical and strategic differences" with Defendant regarding how the case should be handled. Defendant then expressed his displeasure with the representation provided by Daniel J. Taylor, and the Court relieved Mr. Taylor as counsel of record at a report date held on February 12, 2007. Defendant has now expressed similar dissatisfaction with Mr. Morris.

A court-appointed lawyer is under no obligation to cater to every demand of a defendant. Mr. Morris is a criminal trial attorney with sufficient experience to give advice and to determine what issues should be raised in a criminal proceeding. Not every issue that a defendant (or his "jailhouse lawyer") wants raised should be raised. An attorney may have many reasons for raising, or not raising, certain issues, as well as ethical issues to consider.

This case is currently set for trial on August 8, 2007. It appears that the Defendant is merely attempting to manipulate the Court and delay this case indefinitely by continually asking for new counsel. The Court is certain that if Defendant were provided with a fourth attorney, he would soon find fault with that individual as well.

(No. 06-10004-JDT, ECF No. 77 at 1-2.)

On the first day of trial, Morris addressed the Court about the issues that Higgins had attempted to raise in his *pro se* filings. Morris stated that he had made a strategic decision not to supplement the motion to dismiss that Taylor had filed. (No. 06-10004-JDT, 08/08/2007 Trial Tr., ECF No. 113 at PageID 314.) He also stated that

Mr. Higgins is not satisfied with my services. As far as I'm concerned, I've interviewed every witness in his case, maybe with the exception of Lieutenant Willis, who I haven't talked to personally about this case. I don't know what else I can do as a lawyer preparing for this case.

And with that being said, I can't tell Your Honor that I'm not prepared for this trial. I can't say that. That would be a dishonest answer. Can I say that I would rather not represent Mr. Higgins? Yes, sir, I can say that, but I cannot tell you I'm not prepared.

(*Id.*) The Court reiterated that Morris would not be relieved:

Well, I understand the difficulty you face in this case, Mr. Morris. It appears that Mr. Higgins has fallen into the clutches of a jailhouse lawyer or perhaps Mr. Higgins is the jailhouse lawyer. I can't tell you.

All I know is that Mr. Higgins wasn't happy with Mr. Farese and Mr. Farese was replaced. Then Mr. Higgins wasn't happy with Mr. Taylor and Mr. Taylor was replaced. Mr. Higgins is not happy now with Mr. Morris. I'm not sure we've got a lawyer in the Southeastern United States that Mr. Higgins is going to like. And there comes a point at which we can't just keep replacing counsel and keep postponing the case.

I understand the difficulty one has, Mr. Morris, in representing a client who's not happy with him. I used to be a lawyer and I have been where you are today. All we can do is the best we can do. And I have previously denied Mr. Higgins' request—I'm sorry, your request to be relieved as counsel. I sympathize with you. I understand the difficulties you have in representing a client who doesn't want you to be his lawyer. But as I indicated, we're not going to be able to satisfy Mr. Higgins. So this case has got to proceed, and you'll just have to do the best you can under difficult circumstances.

(*Id.* at PageID 314-315.)

Although sub-claim (f) is an ineffective-assistance claim rather than a challenge to the Court's refusal to permit Morris to withdraw, the Court will, briefly, elaborate on why it denied Morris's motion for leave to withdraw to make clear that there was little that Morris could say that would have persuaded the Court to permit him to withdraw. The legal standards for evaluating a claim that a district judge erred in denying an attorney's request to withdraw are as follows:

Under the Sixth Amendment, a criminal defendant has the right to have the assistance of counsel for his defense. U.S. Const. amend. VI. If a defendant does not require court-appointed counsel, "the Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds." *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624–25 (1989). In the case of an indigent defendant, the "right to counsel of choice, unlike the right to counsel, however, is not absolute." *United States v. Iles*, 906 F.2d 1122, 1130 (6th Cir. 1990). Rather, an indigent defendant does not have a right to have a particular attorney represent him, and he must show good cause to warrant a substitution of counsel. *Id.* We review for abuse of discretion a district court's decision regarding the substitution of counsel. *United States v. Vasquez*, 560 F.3d 461, 466 (6th Cir. 2009); *United States v. Mooneyham*, 473 F.3d 280, 291 (6th Cir. 2007).

To determine whether a district court has abused its discretion in denying a motion to substitute counsel, the Court considers several factors. These factors include "the timeliness of the motion; the adequacy of the court's inquiry into the defendant's complaint; and whether the conflict between the attorney and client was so great that it resulted in a total lack of communication preventing an adequate defense." *Mooneyham*, 473 F.3d at 291 (quoting *United States v. Saldivar–Trujillo*, 380 F.3d 274, 277 (6th Cir. 2004)). The Court also balances

the defendant's right to counsel of his choice with the public's right to a "prompt and efficient administration of justice." *Id.*

*United States v. Johnson,* ___ F. App'x ___, 2015 WL 3505223, at *3 (6th Cir. 2015); *see also United States v. Mack,* 258 F.3d 548, 556 (6th Cir. 2001) ("(1) the timeliness of the motion, (2) the adequacy of the court's inquiry into the matter, (3) the extent of the conflict between the attorney and client and whether it was so great that it resulted in a total lack of communication preventing an adequate defense, and (4) the balancing of these factors with the public's interest in the prompt and efficient administration of justice").

The motion to withdraw was not timely, having been filed more than eighteen months after the commencement of the action and virtually on the eve of trial. "[A] substitution on the eve of trial necessitates a continuance and frustrates another judicial concern, the vindication of the public's interest in a speedy trial." *Johnson,* 2015 WL 3505223, at *3; *see also United States v. Whitfield,* 259 F. App'x 830, 834 (6th Cir. 2008) (per curiam) (noting that "when the granting of the defendant's request would almost certainly necessitate a last-minute continuance, the trial judge's actions are entitled to extraordinary deference" (internal quotation marks omitted)).

Although the Court did not invite Higgins to testify about the nature of his dissatisfaction with Morris, his letter and Morris's motion made clear the nature of the disagreement. Both filings stated that Higgins's dissatisfaction stemmed from Morris's handling of the motion to suppress. The motion to suppress had been fully addressed, and the Court was disinclined to spend additional time on it, agreeing with Morris that Higgins could pursue the issue on appeal if he so chose. Although Higgins had also mentioned difficulties in communicating with Morris, Morris represented to the Court that he had interviewed the witnesses and was ready to proceed. Higgins's *pro se* motion did not alert the Court to any complete breakdown in communications. Disagreements between a lawyer and his client about strategy and tactics "do not rise to the level

of a total lack of communications preventing an adequate defense." *Johnson,* 2015 WL 3505223, at *6 (internal quotation marks omitted).[16]

To the extent Higgins complains that Morris failed to apprise the Court of a complete breakdown in communications, his claim fails because Morris would not have supported Higgins's position. At the evidentiary hearing, Morris testified that "we were kind of tense sitting next to each other throughout the trial." (Evid. Hr'g Tr., ECF No. 48 at 87.) Likewise, in his affidavit, Morris described his relationship with Higgins shortly before trial as "strained." (ECF No. 10-2.) Nothing in those statements is at all atypical in cases in which a defendant is dissatisfied with his attorney. Morris has made clear that he "moved forward with the case as though Mr. Higgins and I never had any trouble." (Evid. Hr'g Tr., ECF No. 48 at 87; *see also* ECF No. 10-2 ("I did everything in my power to represent Mr. Oliver Higgins zealously and within the bounds of the law.").) That counsel failed to ask certain questions propounded by Higgins does not establish, retroactively, that there had been a complete breakdown in communications at the start of the trial.

Sub-claim (f) is without merit.

In sub-claim (g), Higgins complains that his attorney admitted his guilt before the jury without his consent. (ECF No. 1-1 at PageID 31-32.) Specifically, Higgins complains that Morris "effectively admitted to the jury that the 110.4 grams of cocaine base seized in the china cabinet belonged to the Movant, but that Movant had no knowledge of the contraband that was seized in the bathroom ceiling of [the] apartment." (*Id.* at 18.) At trial, Sergeant Billy Carneal of the Madison County Sheriff's Department testified that, when the search warrant on Higgins's

---

[16] The Court was, of course, aware that similar disagreements about strategy and tactics led Farese and Taylor to withdraw. The affidavit filed by Farese, and the testimony at the evidentiary hearing, demonstrates the falsity of Higgins's statement that Farese "withdrew from the case for reasons unrelated to Movant." (ECF No. 1-1 at PageID 28 n.7.)

apartment was executed, searchers found "crack cocaine [that] had been freshly cooked and placed on waxed paper to dry" in the bottom drawer of a china cabinet." (No. 06-10004-JDT, 08/08/2007 Trial Tr., ECF No. 113 at PageID 405.) The searchers also "found inside the bathroom ceiling a blue bag that had powder cocaine, crack cocaine, money, gun, digital scales, [and] rolling papers . . . ." (*Id.; see also id.* at PageID 413 ("more powder cocaine, crack cocaine, firearm and U.S. currency" were also found in the bathroom ceiling).) Investigators also found marijuana in the ceiling. (*Id.* at PageID 412.) Higgins was asleep in the apartment when the officers arrived (*id.* at PageID 401-02), and he told investigators that "he was the only one that lived there, that no one else lived there. That was his residence." (*Id.* at PageID 442.) During his closing argument, Morris stated that Higgins was "not entirely responsible for all these charges in his indictment" and that "Mr. Higgins had no knowledge of the cocaine that was found in the ceiling of his bathroom." (*Id.* at PageID 493.) Morris did not explicitly state that Higgins admitted that the crack found in the china cabinet was his, although he may have implicitly conceded that by saying that "certain concessions have to be made." (*Id.*) According to Higgins, the concession that he was responsible for the 110.4 grams of cocaine in the china cabinet prejudiced him because that quantity was sufficient to qualify him for the § 851 enhancement and life sentence. (ECF No. 1-1 at PageID 32.)

Even if the Court were to assume that it was inappropriate for Morris to implicitly admit that Higgins was responsible for the drugs in the china cabinet without his authorization, Higgins cannot establish prejudice. The freshly cooked crack cocaine was found in Higgins's apartment, where he was present at the time of the search. No one else lived in that apartment. He cannot satisfy his burden of demonstrating a reasonable probability that, if only counsel had not made

that unauthorized admission, there is a reasonable probability that the outcome of his trial would have been different.  Sub-claim (g) is without merit.

In sub-claim (h), Higgins complains that his attorneys failed to move to disclose the identity of the informant and to investigate the informant's involvement with the case.  (*Id.* at PageID 33-34.)  According to Higgins, "counsels should have, but did not, file motions to identify the CW and subpoena the CW to testify at the Movant's trial" because "[t]he CW had material knowledge related to the events occurring at the Campbell Street apartment that directly involved the CW's later possession of cocaine in Chester County."  (*Id.* at PageID 34.)  Higgins claims that it was the informant who placed the contraband in the ceiling of his apartment.  (*Id.*)

In *Roviaro v. United States,* 353 U.S. 53, 59 (1957), the Supreme Court recognized "the Government's privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law."  The privilege may be overcome where "the disclosure of the informer's identity, or the contents of his communications, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause."  *Id.* at 60-61.  The accused bears "the burden of demonstrating to the court how disclosure of the informant would substantively aid in his defense."  *United States v. Sierra-Villegas,* 774 F.3d 1093, 1099 (6th Cir. 2014), *petition for cert. filed* (U.S. Mar. 25, 2015) (No. 14-9048).  "'Mere speculation' alone is not enough to overcome the privilege."  *Id.* at 1100; *see also United States v. Sales,* 247 F. App'x 730, 734 (6th Cir. 2007) ("Where the defendant's claims are based on mere conjecture or supposition about the possible relevancy of the informant's testimony, such claims are insufficient to warrant disclosure." (internal quotation marks omitted)).  Higgins has not satisfied that burden.

In his legal memorandum, Higgins makes the unsworn statement that it was the informant who placed the contraband in his ceiling. (ECF No. 1-1 at PageID 34.) That argument suffers from two deficiencies. First, as the Court of Appeals noted on direct appeal, the search warrant affidavit did not "contain any assertion that the informant had been inside Higgins's apartment or that the informant had seen drugs or other evidence in or around Higgins's apartment." *United States v. Higgins,* 557 F.3d at 390. Higgins relies on that finding by the Court of Appeals to argue that Morris mishandled the suppression motion. (*See* ECF No. 1-1 at PageID 20, 21.) However, Higgins's position that it was the informant who placed the contraband in his bathroom ceiling is fundamentally inconsistent with his position that the informant had no connection to the interior of his apartment.

Second, Higgins's suggestion that the informant's testimony would have been useful to him is entirely speculative. "[T]he confidential informant was not a necessary witness in the trial to the charged offenses . . . . The defendant was tried only on charges stemming from evidence that was obtained inside the duplex . . . when the officers executed the judicially issued search warrant. The informant's role, on the other hand, was limited solely to his or her participation in earlier, individual drugs buys with which [Higgins] was not charged." *United States v. Carter,* 520 F. App'x 377, 382 (6th Cir.), *cert. denied,* 134 S. Ct. 247 (2013); *see also Beals,* 698 F.3d at 270 (where "[t]he informant helped orchestrate *the search* that led to the discovery of incriminating evidence, not the crimes themselves," the district court did not err in allowing the Government to withhold his identity because he "could not testify to any relevant fact"). Higgins was not entitled to impeach the informant because the Government did not call him as a witness

at the suppression hearing or at trial. *Sierra-Villegas,* 774 F.3d at 1099-1100.[17] If, in fact, the informant did plant freshly cooked crack cocaine in Higgins' apartment, it is not remotely plausible that he would testify at trial to having done so.

Sub-claim (h) is without merit.

In sub-claim (i), Higgins complains that Morris failed to object to, or otherwise preserve for appellate review, the Court's improper handling of jury notes. (ECF No. 1-1 at PageID 35.) Higgins complains that the Court had responded to a note about the U.S. currency that had been admitted into evidence without first notifying counsel. (*Id.*)

Shortly prior to the jury verdict, the Court made the following statement:

> Gentlemen, before the jury is brought in to announce the verdict, I want to tell you about a note I received from the jury and how I answered it. Rather than call you out and have a conference, I knew what the answer had to be, so I answered the note without the conference.

> But the note said something to the effect that was the counterfeit money by itself or was it in the rest of the currency, and I told them that I'm sorry, I couldn't answer their question. I would ask them to rely on their own recollection of the evidence. It's obvious I can't answer their question because I can't comment on the evidence, so I just told the jury to use their own recollection of the evidence.

> We'll have the note reserved and put it in the record in this case.

(08/09/2007 Trial Tr., Crim. ECF No. 114 at PageID 542.)

Higgins argues that, by making an *ex parte* ruling, the Court infringed on his right to be present at trial. "A criminal defendant has a constitutional right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings." *United States v. Riddle,*

---

[17] The testimony at the suppression hearing suggests that defense counsel knew the identity of the informant. (Suppression Hr'g Tr., Crim. ECF No. 112 at 15.) If so, then it was unnecessary to file a motion to reveal the informant's identity because counsel could have subpoenaed him to testify at trial without a motion. *See United States v. Best*, 536 F. App'x 626, 633 (6th Cir. 2013).

249 F.3d 529, 534 (6th Cir. 2001) (internal quotation marks and alteration omitted). However, a violation of the defendant's right to be present ordinarily "is not one of those structural rights whose violation constitutes per se error. Rather, there must be prejudice in the absence to warrant reversal. *Id.*; *see also Moore v. Palmer,* No. 1:09-cv-74, 2011 WL 6997560, at \*11 (W.D. Mich. May 5, 2011) (enumerating structural errors) (report and recommendation), *adopted,* 2012 WL 92732 (W.D. Mich. Jan. 11, 2012).

Higgins cannot satisfy this burden of demonstrating that his attorney was ineffective, or that he suffered any prejudice, arising from his failure to object to the Court's handling of the juror note. The Court declined to make any statement on the evidence and, instead, instructed the jurors that they must rely on their own recollection of the evidence. Higgins does not appear to challenge the Court's substantive response to the note, and he does not suggest anything his attorney should have done had he been present.

Sub-claim (i) is without merit.

In sub-claim (j), Higgins complains that Morris rendered ineffective assistance by failing to object to, or otherwise preserve for appellate review, the Court's non-compliance with the requirements of 21 U.S.C. § 851. (ECF No. 1-1 at PageID 36-37.) Specifically, Higgins complains that the Court failed to comply with § 851(b), which provides as follows:

> If the United States Attorney files an information under this section, the court shall after conviction but before the pronouncement of sentence inquire of the person with respect to whom the information was filed whether he affirms or denies that he has been previously convicted as alleged in the information, and shall inform him that any challenge to a prior conviction which is not made before sentence is imposed may not thereafter be raised to attack the sentence.

21 U.S.C. § 851(b).

Higgins cannot establish either deficient performance or prejudice because he would have been unable to challenge the prior convictions used to enhance his sentence. Higgins has

admitted that "the Sixth Circuit has found harmless error when a District Court fails to conduct § 851(b) inquiry in cases where the defendant's priors are beyond the statute of limitations for challenging them under § 851(e)." (ECF No. 1-1 at PageID 36-37.) Section 851(e) provides that "[n]o person who stands convicted of any offense under this part may challenge the validity of any prior conviction alleged under this section which occurred more than five years before the date of the information alleging such prior conviction." Here, the § 851 notice listed seven previous convictions, all of which occurred more than five years prior to the date of the information. (*See* Crim. ECF No. 78.) Therefore, because the Court's failure to engage in the § 851(b) colloquy was harmless error, *see United States v. Hill,* 142 F.3d 305, 313 (6th Cir. 1998), it cannot provide the basis for an ineffective-assistance claim.

Sub-claim (j) is without merit.

In sub-claim (k), Higgins alleges that his sentencing counsel rendered ineffective assistance by failing to argue, and make a record for appellate review, of previous counsels' ineffectiveness, including Morris's failure to inform him of the filing of the § 851 notification. (ECF No. 1-1 at PageID 37-38.) This sub-claim is meritless because ineffective-assistance claims are typically raised in § 2255 proceedings, where matters outside the record can be considered. *See, e.g., United States v. Angel,* 355 F.3d 462, 469 (6th Cir. 2004) ("We will generally not address on direct appeal claims of ineffective assistance unless the record has been sufficiently developed to provide meaningful factual review. Direct appeal is the appropriate forum, however, for ineffective-assistance claims that either depend entirely upon facts within the record or that present purely legal questions.").[18] Even if any of Higgins's ineffective-

---

[18] Golden was not ineffective in failing to develop a factual record to support Higgins's ineffective-assistance claims because the Court would not have allowed him to do so. The proper venue for those claims is a § 2255 motion.

assistance claims could have been raised on direct appeal, he suffered no prejudice because he was able to raise them in his § 2255 motion. *Massaro v. United States,* 538 U.S. 500, 504 (2003) (ineffective-assistance claim can be addressed under § 2255 even when it could have been raised on direct appeal).

Sub-claim (k) is meritless.

For all the foregoing reasons, the Court DENIES relief on Claim 1.

**B.      Ineffective Assistance of Appellate Counsel (Claim 2)**

In Claim 2, Higgins alleges that his appellate counsel rendered ineffective assistance, in violation of the Sixth Amendment. (ECF No. 1 at PageID 5.) Specifically, Higgins complains that his appellate counsel (a) failed to brief and argue the complete breakdown of attorney-client relations between Higgins and Morris (ECF No. 1-1 at PageID 38-39); (b) failed to brief and argue the Court's denial of Higgins's *pro se* motions (*id.* at PageID 39); (c) failed properly to brief and argue Higgins's Fourth Amendment claims (*id.*); (d) failed to brief and argue the Court's non-compliance with 21 U.S.C. §§ 851(b)-(c) (*id.*); (e) failed to raise the ineffectiveness of Morris and, in particular, his failure to inform Higgins about the § 851 notification (*id.*); and (f) failed to brief and argue the Court's improper limitation of the cross-examination of Billy Carneal (*id.* at PageID 39-40).

Claims of ineffective assistance of appellate counsel are evaluated using the *Strickland* standards. *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000) (applying *Strickland* to claim that appellate counsel rendered ineffective assistance by failing to file a merits brief); *Smith v. Murray*, 477 U.S. 527, 535-36 (1986) (failure to raise issue on appeal). To establish that appellate counsel was ineffective, a prisoner

> must first show that his counsel was objectively unreasonable in failing to find
> arguable issues to appeal—that is, that counsel unreasonably failed to discover

nonfrivolous issues and to file a merits brief raising them. If [the prisoner] succeeds in such a showing, he then has the burden of demonstrating prejudice. That is, he must show a reasonable probability that, but for his counsel's unreasonable failure to file a merits brief, he would have prevailed on his appeal.

*Smith v. Robbins*, 528 U.S. at 285 (citation omitted).[19]

To the extent that sub-claim (a) is a challenge to the Court's failure to grant Morris's motion to withdraw, it is meritless for the reasons previously stated. *See supra* pp. 78-80. To the extent that sub-claim (a) is a challenge to appellate counsel's failure to raise an ineffective-assistance claim based on Morris's purported failure to explain properly his reasons for seeking to withdraw, it is meritless because it depended on matters outside the record and, therefore, was not properly raised on direct appeal. In either case, sub-claim (a) is without merit.

Sub-claim (b) is without merit because a defendant who is represented by counsel is not entitled to file *pro se* motions. *See supra* p. 75.

---

[19] The Sixth Circuit has stated a nonexclusive list of factors to consider when assessing claims of ineffective assistance of appellate counsel:

1.  Were the omitted issues "significant and obvious?"

2.  Was there arguably contrary authority on the omitted issues?

3.  Were the omitted issues clearly stronger than those presented?

4.  Were the omitted issues objected to at trial?

5.  Were the trial court's rulings subject to deference on appeal?

6.  Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?

7.  What was the appellate counsel's level of experience and expertise?

8.  Did the petitioner and appellate counsel meet and go over possible issues?

9.  Is there evidence that counsel reviewed all the facts?

10. Were the omitted issues dealt with in other assignments of error?

11. Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

*Franklin v. Anderson*, 434 F.3d 412, 429 (6th Cir. 2006) (citation omitted).

Sub-claim (c) is meritless because Higgins has not demonstrated that, if only his attorney had addressed the good-faith exception to the exclusionary rule in his appellate brief, there is a reasonable probability that the outcome of the appeal would have been different. Higgins has not presented any argument that might have overcome the good-faith exception.

Sub-claim (d) is meritless because Higgins suffered no prejudice from the Court's failure to engage in the colloquy required by 21 U.S.C. § 851(b). *See supra* pp. 85-86.

Sub-claim (e) is without merit because ineffective-assistance claims are properly brought in § 2255 motions. *See supra* pp. 86-87.

In sub-claim (f), Higgins complains that the Court improperly limited the cross-examination of Billy Carneal. In particular, Higgins complains that, "[a]t one point during the cross-examination of Officer Carneal trial counsel was restricted from asking questions related to the circumstances surrounding CW being stopped in Chester County and the CW possible involvement with the drugs seized from Movant's apartment." (ECF No. 1-1 at PageID 40.) However, Higgins cannot show deficient performance or prejudice. For the reasons previously stated, the identity of the CW was shielded by the informant's privilege. *See supra* pp. 82-84. Higgins's conclusory assertion the informant might have been responsible for some of the drugs found in his apartment is too speculative to overcome the privilege. The circumstances of the traffic stop of the informant's vehicle was not relevant to any issue at trial. Sub-claim (f) is meritless.

Therefore, Claim 2 is without merit, and relief on that basis is also DENIED.

## C.  The Prosecution's Alleged Withholding of Information (Claim 3)

In Claim 3, Higgins asserts, without elaboration, that the Government withheld favorable evidence from the defense, thereby depriving him of a fair trial and due process of law. (ECF

No. 1 at PageID 7.)  Higgins has not briefed this issue, and he has not described the evidence that he contends the Government withheld.  Therefore, Higgins has not provided an adequate factual basis for Claim 3.

The § 2255 Rules require that a motion under 28 U.S.C. § 2255 must "specify all the grounds for relief available to the moving party" and "state the facts supporting each ground." Rule 2(b)(1)-(2), § 2255 Rules.

> To warrant plenary presentation of evidence, the application must contain assertions of fact that a petitioner is in a position to establish by competent evidence. Whether there is a genuine issue of material fact depends upon the sufficiency of those factual allegations.  Airy generalities, conclusory assertions and hearsay statements will not suffice because none of these would be admissible evidence at a hearing.

*United States v. Aiello*, 814 F.2d 109, 113-14 (2d Cir. 1987) (citations omitted); *accord Blackledge v. Allison*, 431 U.S. 63, 75-76 (1977) (noting that more than notice pleading is required in habeas petitions); *Taylor v. United States*, 287 F.3d 658, 661 (7th Cir. 2002) (noting that, while notice pleading is the standard in ordinary civil litigation, "Rule 2(b) departs from Rule 8 [of the Federal Rules of Civil Procedure] by requiring some fact pleading"); *Short v. United States*, 504 F.2d 63, 65 (6th Cir. 1974) ("There is here no substantial allegation or new dispute of fact that would entitle appellant to a full evidentiary hearing, as petitioner's claims are stated in the form of conclusions without any allegations of facts in support thereof, as well as being unsupported by proof or reference to such proof; and his motion is, thus, legally insufficient to sustain a review."); *Kidd v. United States*, Nos. 1:12-cv-358/1:10-cr-114, 2013 WL 6795977, at *1, *10 (E.D. Tenn. Dec. 20, 2013) (dismissing § 2255 motion *sua sponte* for failure to comply with Rule 2(b)); *United States v. Domenech*, No. 1:06-cr-245-2, 2013 WL 3834366, at *2 (W.D. Mich. July 24, 2013) (dismissing § 2255 motion where defendant did not file a memorandum stating the basis for his ineffective assistance claim); *United States v. Kerr*,

Nos. 95-80972, 03-72148, 2005 WL 1640343, at *2 (E.D. Mich. July 8, 2005) (dismissing § 2255 motion for failure to comply with Rule 2(b)).

Higgins's presentation of Claim 3 is entirely conclusory because he has not identified the evidence that he claims was withheld by the Government. Therefore, relief is DENIED on Claim 3.

Because the issues presented by Movant do not warrant relief, his § 2255 Motion is DENIED in its entirety.

## IV.    APPEAL ISSUES

Twenty-eight U.S.C. § 2253(a) requires the district court to evaluate the appealability of its decision denying a § 2255 motion and to issue a certificate of appealability ("COA") "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also* Fed. R. App. P. 22(b). No § 2255 movant may appeal without this certificate.

A COA may issue only if the petitioner has made a substantial showing of the denial of a constitutional right, and the COA must indicate the specific issue(s) which satisfy the required showing. 28 U.S.C. §§ 2253(c)(2)-(3). A "substantial showing" is made when the movant demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotation marks and citation omitted); *see also Henley v. Bell*, 308 F. App'x 989, 990 (6th Cir. 2009) (per curiam) (same). A COA does not require a showing that the appeal will succeed. *Miller-El*, 537 U.S. at 337; *Caldwell v. Lewis*, 414 F. App'x 809, 814-15 (6th Cir.

2011) (same).  Courts should not issue a COA as a matter of course.  *Bradley v. Birkett*, 156 F. App'x 771, 773 (6th Cir. 2005).

There can be no question that the issues raised in Movant's § 2255 Motion are meritless for the reasons previously stated.  Because any appeal by Movant on the issues raised in his § 2255 Motion does not deserve attention, the Court DENIES a certificate of appealability.

In order to appeal *in forma pauperis* in a § 2255 case, and thereby avoid the $505 appellate filing fee required by 28 U.S.C. §§ 1913 and 1917, the prisoner must obtain pauper status pursuant to Federal Rule of Appellate Procedure 24(a).  *Kincade v. Sparkman*, 117 F.3d 949, 951-52 (6th Cir. 1997).  Rule 24(a) provides that a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit.  Fed. R. App. P. 24(a)(1).  However, Rule 24(a) also provides that if the district court certifies that an appeal would not be taken in good faith, or otherwise denies leave to appeal *in forma pauperis*, the prisoner must file his motion to proceed *in forma pauperis* in the appellate court.  *See* Fed. R. App. P. 24(a)(4)-(5).

In this case, for the same reasons the Court denies a certificate of appealability, the Court determines that any appeal would not be taken in good faith.  It is therefore CERTIFIED, pursuant to Federal Rule of Appellate Procedure 24(a), that any appeal in this matter would not be taken in good faith, and leave to appeal *in forma pauperis* is DENIED.  Accordingly, if Movant files a notice of appeal, he must also pay the full $505 appellate filing fee or file a motion to proceed *in forma pauperis* and supporting affidavit in the Sixth Circuit Court of Appeals.

The Clerk is directed to prepare a judgment.

IT IS SO ORDERED.

s/ **James D. Todd**
JAMES D. TODD
UNITED STATES DISTRICT JUDGE